CHRISTINE HAMMOND, SBN 206768
JONATHAN KOLTZ, SBN 268793
DAVID W. FERMINO, SBN 154131
IAN CULVER, SBN 245106
VANESSA BALDWIN, SBN 276766
Public Utilities Commission
of The State of California
505 Van Ness Avenue
San Francisco, CA 94102
Telephone: 415-696-7359
Email: david.fermino@cpuc.ca.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ASSURANCE WIRELESS USA, LP, et al<br><br>                                    Plaintiffs,<br><br>v.<br><br>ALICE B. REYNOLDS, President of the California Public Utilities Commission, in her official capacity; KAREN DOUGLAS, Commissioner of the California Public Utilities Commission, in her official capacity; DARCIE L. HOUCK, Commissioner of the California Public Utilities Commission, in her official capacity; JOHN REYNOLDS, Commissioner of the California Public Utilities Commission, in his official capacity; and GENEVIEVE SHIROMA, Commissioner of the California Public Utilities Commission, in her official capacity,<br><br>                                    Defendants. | Case No.: 3:23-cv-00483-LB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DECLARATION OF IAN CULVER** |

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3
Introduction.................................................................................1

4
Background ................................................................................2

5
Argument: The T-Mobile Carriers Have Not Clearly Shown That They Are
Entitled To A Preliminary Injunction ......................................7

6
    I.      Requirements for Preliminary Injunction.............................7

7
    II.    The T-Mobile Carriers have not demonstrated a serious question
on the merits, much less that they are likely to prevail. .......................8

8

9
        A.    Because any harm they may suffer is of their own making, the
T-Mobile Carriers lack standing to sue.........................................8

10
        B.    Federal law does not expressly pre-empt the Commission's
Decision...................................................................13

11

12
    III.  Because the T-Mobile Carriers seek to suborn California's regulatory
scheme to their private interests, the balance of equities and the public
interest tip sharply against them............................................18

13

14
    IV.  The Motion suffers from several procedural defects. .........................22

15
        A.    Objection to the Declaration of John Barnes. ............................22

16
        B.    The T-Mobile carriers have not posted a bond pursuant to Fed. R.
Civ. P. 65(c). ...............................................................23

17
Conclusion ..............................................................................24

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...............7

*Al-Otro-Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ...............................................11

*Arizona v. United States*, 567 U.S. 387 (2012) .......................................................13

*Barnum Timber Co. v. EPA,* 633 F.3d 894 (9th Cir. 2011) ......................................9

*Bernhardt v. Los Angeles Cnty.,* 339 F.3d 920 (9th Cir. 2003) .............................18

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...............................................9

*Clinton v. Jones*, 553 U.S. 674 (2008) ......................................................................8

*Damus v. Nielsen*, 313 F.Supp. 3d 317 (D.D.C 2018) ............................................18

*Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984) .................22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) .............................13

*Hillsborough Cnty. v. Automated Med. Labs, Inc.,*
    471 U.S. 707 (1985) ...........................................................................................16

*hiQ Labs, Inc. v. LinkedIn Corp.,* 31 F.4th 1180 (9th Cir. 2022) .........................18

*Index Newspapers LLC v. U.S. Marshals Serv.,*
    888 F.3d 1020 (9th Cir. 2018) ........................................................................9, 2

*Int'l Modelers & Allied Workers Local Union No. 164 v. Nelson,*
    799 F.2d 547 (9th Cir. 1986) .............................................................................8

*Lopez v. Candfaele*, 630 F.3d 775 (9th Cir. 2010) ................................................8, 9

*Lujan v. Def. of Wildlife*, 504 U.S. 555 (1992) .........................................................8

*Mayview Corp. v. Rodstein*, 480 F.2d 714 (9th Cir. 1973) ......................................8

*MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106 (9th Cir. 2020) ..................3, 15, 16

*Munaf v. Geren*, 553 U.S. 674 (2008) ......................................................................7

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................7

*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,*
    762 F.2d 1374, 1377 (9th Cir. 1985) ................................................................12

*People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,*
    766 F.2d 1319 (9th Cir. 1995) ..........................................................................23

*Sable Commc'ns of Cal., Inc. v. Pac. Tel. & Tel. Co.,*
    890 F.2d 184, 191 (9th Cir. 1989) .....................................................................4

ii

*South Bay United Pentecostal Church v. Newsom*,
   __ U.S. __,140 S.Ct. 1613 (2020)................................................................7

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ...............................................13

*T-Mobile South, LLC v. City of Roswell*, 574 U.S. 293 (2015) ...........................2

*Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013)...........................................9

*Util. Reform Network v. Cal. Pub. Util. Comm'n*,
   26 F.Supp.2d 1208 (N.D. Cal. 1997)..............................3, 14, 15, 16

*US Auto Parts Network, Inc., v. United States*, 319 F. Supp. 3d. 1303
   (Ct. Int'l Trade 2018).................................................................18

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ..........................7, 18


**Commission Decisions**

D.94-09-065 .....................................................................................10

D.96-10-066 .....................................................................................10

D.22-10-021 ...............................................................................*passim*


**California Constitution**

Cal. Const., art. XII, §§ 1-6 ................................................................4


**California Public Utilities Code**

§§ 270-281 ......................................................................................4

§§ 233-234 ......................................................................................5

§ 701...............................................................................................4

§ 1731.............................................................................................6

§ 1735.............................................................................................6


**Commission Rules of Practice and Procedure**

Rule 16.1 .........................................................................................6

**United States Code**

47 U.S.C. § 151, *et seq.*..................................................................................13

47 U.S.C. § 254(d) ........................................................................................15

47 U.S.C. § 254(f)..................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 43(c) ......................................................................................23

Fed. R. Civ. P. 65(c) ......................................................................................23

N.D. Cal. L.R. 7-6..........................................................................................23

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

## Introduction

The Plaintiffs, Assurance Wireless USA, L.P., MetroPCS California, LLC, Sprint Spectrum LLC, T-Mobile USA, Inc., and T-Mobile West LLC (collectively, "T-Mobile Carriers"), a family of wireless carriers, ask the Court to preliminarily enjoin an October 2022 Decision of the Defendant Commissioners of the California Public Utilities Commission ("Commission"), which is set to take effect on April 1, 2023. The Commission asks the Court to deny the motion.

This case is about the way California funds its telecommunications universal service programs—programs that collectively aid millions of people. These funds are supported by surcharges and, to ensure the health of these programs, California is moving from six separate surcharges based on telephone carriers' revenues—a mechanism that has become inequitable, unpredictable, and unsustainable—to one flat-rate surcharge on connections (or "access lines," as defined by the Commission). Unlike both the federal government and some states, in California it is not the telephone carriers that bear the surcharge burden: by law the surcharge falls on the end user; the role of the carriers is only to collect the surcharge and remit those moneys to the Commission.

And that leads to the first problem with the T-Mobile Carriers' motion, and with their case as a whole: although they assert that the switch from a revenue-based surcharge to one levied on access lines will cost them money, they are complaining about money that they need not pay. Some telephone carriers—including some of the plaintiffs here—choose to assume the surcharge burden on their customers' behalf, but that's a business decision: it allows them to present their customers with an all-inclusive bill rather than breaking out the surcharge amounts separately. Because the surcharge falls by law on the end user, any economic harm the T-Mobile Carriers might sustain here is a result of their own choices, not anything the Commission has done. Nor can the T-Mobile Carriers plausibly claim they will suffer some

1   disproportionate harm to their reputation or their ability to compete: because the

2   surcharge will fall evenly on every user of telephone service in the State, every

3   telephone corporation in the State will be subject to the same forces.  The T-Mobile

4   Carriers thus lack standing.  Even setting that aside, the Carriers have not shown that

5   an access-line surcharge—which other states have adopted—violates federal

6   communications law.[1]  The T-Mobile Carriers are unlikely to succeed on the merits

7   and, because they have not shown any harm that is not of their own making, much less

8   irreparable harm, fail the second prong of the test as well.

9       Turning to the equities and the public interest: this eleventh-hour challenge,

10  which the T-Mobile Carriers could have brought months ago, would disrupt a complex

11  administrative process that both the Commission and the State's other telephone

12  corporations have been working diligently to implement, burdening them, confusing

13  California's telephone consumers, and leaving in place a failing mechanism.  All this,

14  again, because the T-Mobile Carriers are complaining about a surcharge that does not

15  legally fall on them.  The balance of equities and the public interest tip sharply against

16  granting the preliminary injunction.

17      The T-Mobile Carriers have not shown that they are clearly entitled to the

18  extraordinary and drastic relief they seek.  The Court should deny their motion.

19                          **Background**

20      This case concerns the intersection between federal and state communications

21  law.  The Telecommunications Act of 1996 set up a dual regulatory scheme for the

22  preservation and advancement of universal service, with the federal government and

23  the states engaging in an exercise of co-operative federalism.  *See T-Mobile South,*

24  *LLC v. City of Roswell*, 574 U.S. 293, 303 (2015).  As the Ninth Circuit has explained:

25

26  _____

27  [1] In their Complaint, the Wireless Carriers also assert that the access-line surcharge
    impermissibly burdens interstate commerce, *see* Compl. at ¶ 6, but in this Motion they seem

28  to have abandoned that argument: it does not appear.

1
2
3
4
5
6
7
8
9

> The universal availability of critical telecommunications services is "a fundamental goal of federal telecommunications regulation." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009).  From its inception, the FCC has been charged with "mak[ing] available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide . . . communication service with adequate facilities at reasonable charges." Communications Act of 1934, Pub. L. No. 73-416, § 1, 48 Stat. 1064, 1064. States have also historically "exercised their jurisdictional authority to ensure the availability of universal service." *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 24744, 24747 (1998) ("1998 Universal Service Decision").

10

*MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1110 (9th Cir. 2020).

11
12
13
14
15
16
17
18
19
20
21
22
23
24

In the '96 Act, Congress explicitly gave states the authority to support their universal service programs "in a manner determined by the State to the preservation and advancement of universal service in that State," so long as the support mechanism is "not inconsistent with" the FCC's rules and does not "rely on or burden" Federal universal service support mechanisms.  47 U.S.C § 254(f).  The states must also ensure that "[e]very telecommunications carrier that provides intrastate telecommunications services shall contribute [to the state fund] on an equitable and non-discriminatory basis."  *Id.*  Neither the FCC nor the Courts have interpreted Section 254(f)'s limiting provisions to require states to use a universal service funding mechanism identical to the FCC's.  California has long differed from the FCC in requiring universal service contributions from customers ("end users"), as opposed to carriers, who are responsible for contributions to the federal Universal Service Fund.[2]  *See generally Util. Reform Network v. Cal. Pub. Util. Comm'n*, 26 F.Supp.2d 1208 (N.D. Cal. 1997) ("*TURN*").

25

---

26
27
28

[2] While the FCC does allow carriers to recoup these contributions from their customers, they are not required to do so.  FCC, *Contribution Methodology and Administrative Filings*, *available at* https://www.fcc.gov/general/contribution-methodology-administrative-filings (last visited Feb. 26, 2023).

The California Public Utilities Commission[3] is responsible for administering California's six Universal Service Public Purpose Programs ("PPPs").  This includes the collection of surcharges to fund these programs, as well as a user fee that funds the Commission's operating budget.  The six PPPs, as set forth in California Public Utilities Code Sections 270 to 281, are:

1. Universal LifeLine Telephone Service, which provides discounted home phone and cellular phone services to qualifying low-income households;

2. The Deaf and Disabled Telecommunications Program, which provides telecommunications devices to deaf or hearing-impaired consumers;

3. The California High-Cost Fund A, which subsidizes small local exchange carriers ("LECs") for providing telephone service to residential customers in rural high-cost areas;

4. The California High-Cost Fund B, which subsidizes carriers of last resort for providing telephone service to residential customers in rural high-cost areas;

5. The California Teleconnect Fund, which provides discounted communications services to schools, libraries, hospitals, and other non-profit organizations; and

6. The California Advanced Services Fund, which supports the deployment of broadband facilities and broadband services adoption in unserved and underserved areas.

California's PPP surcharges and the user fee are currently assessed on revenue from intrastate telecommunications services sold in California.  *See Decision Updating the Mechanism for Surcharges to Support Public Purpose Programs*, D.22-10-021, at 3 (Cal. P.U.C. Oct. 20, 2022) ("Decision"), *available at* https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M497/K868/497868303.PDF These surcharges are assessed and collected by telephone corporations, *see* Cal. Pub.

---

[3] The Commission is an arm of the State, *Sable Commc'ns of Cal., Inc. v. Pac. Tel. & Tel. Co.,* 890 F.2d 184, 191 (9th Cir. 1989), and has broad authority to regulate utilities.  Cal. Const., art. XII, §§ 1-6; Cal. Pub. Util. Code § 701.

1   Util. Code §§ 233-234 (defining "telephone lines" and "telephone corporations"), as a

2   percentage of an end user's telephone bill.  Decision at 3.  The service providers report

3   and remit the surcharges monthly or bi-annually to the Commission.  *Id.*

4          Although more people than ever are using telecommunications services, due to

5   changes in technology and patterns of use, less and less of this service is surchargeable.

6   *Id.* at 11-12. Year-over-year declines in the intrastate billing base for surcharges have

7   thus resulted in lower surcharge revenue collected for all PPPs compared to the amount

8   forecasted.  *Id.* at 3.  To maintain the funds, the Commission has had to continuously

9   increase the surcharge amount on that declining surcharge base.[4]  *Order Instituting*

10  *Rulemaking to Update Surcharge Mechanisms to Ensure Equity and Transparency of*

11  *Fees, Taxes and Surcharges Assessed on Customers of Telecommunications Services in*

12  *California*, R.21-03-002, at 5-8 (Cal. P.U.C. Mar. 11, 2021) ("Order Instituting

13  Rulemaking") *available at*

14  https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M370/K649/370649478.PDF.

15  That is both unfair to those who must pay those ever-higher amounts and unsustainable

16  in the long term.  The Commission thus opened a rulemaking in March 2021 to find a

17  sustainable, straightforward, and technology-neutral mechanism for telephone

18  corporations to collect and remit surcharges.  Decision at 3-4; *see also generally* Order

19  Instituting Rulemaking.

20         The Commission's March 2021 Order Instituting Rulemaking notified parties

21  that the Commission would consider the following issues:

22

23

24  _____

25  [4] Similarly, the FCC has had to increase its contribution rates for the Universal Service Fund

26  due to decreasing reportable interstate revenue.  On July 1, 2022 the FCC increased the
    Universal Service Fund rates to 33% in the third quarter of 2022, up from 23.8% in the second

27  quarter of 2022.  In the first quarter of 2017, it was as low as 16.7%.  *See Report on the*
    *Future of the Universal Service Fund, Report*, WC Docket No. 21-476 at ¶ 91.

28

    A.  Phase 1 - Consider reforming the surcharge mechanism for the state PPPs and user fee from the existing revenue-based approach to a per access-line flat-rate end-user mechanism by January 1, 2022; and

    B.  Phase 2 - Review the reasonableness of the PPP surcharges and user fees that telecommunications service providers impose on end users, as well as additional taxes, fees and surcharges assessed by federal, state, and local governments.

The proceeding sought to address the existing higher funding burden on wireline end users.  Order Instituting Rulemaking at 1, 7-8.

After multiple rounds of notice and comment, in which the T-Mobile Carriers indirectly participated through the Cellular Telecommunications Industry Association ("CTIA"), the challenged Commission Decision adopted a new surcharge mechanism, which will levy a flat surcharge of $1.11 per month on each access line in California, to be paid by the end user.  Decision at 59.  Persons enrolled in the California LifeLine program and incarcerated persons will be exempt.  *Id.* at 2.

The Decision became effective on October 24, 2022, and the new assessment and collection requirements will go into effect on April 1, 2023.  No industry, consumer, or other parties to the proceeding exhausted their administrative remedies to appeal the Decision pursuant to state law and the Commission's Rules.  *See* Cal. Pub. Util. Code § 1731; Cal. Pub. Util. Comm'n Rules of Practice and Procedure, Rule 16.1.  Since the Decision issued, the Commission and presumably all telecommunications service providers subject to the Decision have expended resources to update their systems in accordance with the access line reporting and remittance mechanism.[5]  *See* Cal. Pub. Util. Code § 1735 (requiring compliance with a Commission order while application for rehearing is pending).

---

[5] On December 7, 2022, Commission staff notified all telecommunications service providers of the Decision's requirements, including the April 1, 2023 effective date for implementing

On February 1, 2023—more than three months after the Decision issued—the T-Mobile Carriers brought their Complaint and Motion for a Preliminary Injunction.

> **Argument: The T-Mobile Carriers have not clearly shown that they are entitled to a preliminary injunction.**

## I.   Requirements for Preliminary Injunction

"A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689 (2008), that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Such relief should only be granted "where the legal rights at issue are indisputably clear and, even then, sparingly and in the most critical and exigent circumstances." *South Bay United Pentecostal Church v. Newsom*, __U.S. __, __, 140 S.Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (internal quotation marks omitted).

To qualify for an injunction, the moving party must show (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of the relief; (3) that the balance of equities tips in its favor; and (4) that the relief is in the public interest.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Alternatively, in this Circuit, relief may be granted on a showing that there are "'serious questions going to the merits and a balance of hardships that tips sharply towards" the movant, but only if the movant "also shows a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Where, as here, a government agency is a party, the "balance of the equities" and the "public interest" factors merge.  *Nken*, 556 U.S. at 435.  The burden

---

the access line flat rate surcharge.  California law requires compliance with a Commission order even if a party had appealed the decision by filing an application for rehearing.  Cal. Pub. Util. Code § 1735.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

at all times is on the plaintiffs to clearly prove every factor. *Clinton v. Jones*, 553 U.S. 674, 689 (2008).

In addition, "[i]n deciding a motion for preliminary injunction, the district court 'is not bound to decide . . . disputed questions of fact.'" *Int'l Modelers & Allied Workers Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986). Rather, in the presence of such crucial, disputed facts, the court should deny the preliminary injunction and "the matter should proceed to adjudication on the merits." *Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973). In this case, given the opportunity, the Commission would dispute many of the material facts on which the T-Mobile Carriers rely for the argument they are likely to prevail on the merits.

## II. The T-Mobile Carriers have not demonstrated a serious question on the merits, much less that they are likely to prevail.

The T-Mobile Carriers claim that the accessline surcharge violates two provisions of 47 U.S.C. § 254(f): that requiring state universal service funding mechanisms to be "not inconsistent with" the federal mechanism, and that requiring the state mechanisms to be equitable and nondiscriminatory; the Commission believes these claims are baseless. In pressing their claims, the T-Mobile Carriers seek drastic equitable relief requiring this Court to resolve numerous questions of fact in the Carriers' favor—facts that the Commission would dispute, if necessary. But it's not necessary. The Court need not resolve these questions before parsing whether the Carriers have established the "irreducible constitutional minimum" of Article III standing.

### A. Because any harm they may suffer is of their own making, the T-Mobile Carriers lack standing to sue.

To determine whether the T-Mobile Carriers are entitled to a preliminary injunction, this Court must first determine whether they have standing to challenge the Decision. "In order to invoke the jurisdiction of the federal courts a plaintiff must establish 'the irreducible constitutional minimum of standing.'" *Lopez v. Candfaele*,

1    630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560

2    (1992)).  Article III standing has three elements: "(1) injury-in-fact – plaintiff must

3    allege concrete and particularized and actual or imminent harm to a legally protected

4    interest; (2) casual connection – the injury must be fairly traceable to the conduct

5    complained of; and (3) redressability - a favorable decision must be likely to redress

6    the injury-in-fact." *Barnum Timber Co. v. EPA,* 633 F.3d 894, 897 (9th Cir. 2011)

7    (citing *Lujan,* 504 U.S. at 560-61) (internal quotation marks omitted).

8        The Supreme Court has "repeatedly reiterated . . . that allegations of a *possible*

9    future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

10   (2013) (cleaned up; emphasis in original).  Instead, the T-Mobile Carriers must

11   establish a threatened injury that is "certainly impending" or that "there is a substantial

12   risk the harm will occur." *Index Newspapers LLC v. U.S. Marshals Serv.,* 888 F.3d

13   1020, 1024 (9th Cir. 2018).

14       The T-Mobile Carriers bear the burden to establish each element of standing

15   "with the manner and degree of evidence required" for any stage of the litigation.

16   *Lujan*, 504 U.S. at 561.  Even at the preliminary injunction stage, the T-Mobile

17   Carriers must make a "clear showing" of each element of Article III standing.

18   *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).  The T-Mobile Carriers have

19   not established Article III standing.

20       The T-Mobile Carriers offer two kinds of payment plans, which they call tax-

21   inclusive and tax-exclusive.  *See* Compl. at ¶¶ 12-13.  In tax-inclusive plans, all taxes,

22   fees, and surcharges are included in a single rate.  *Id.* at ¶ 12.  In tax-exclusive plans,

23   those charges are broken out as separate line items on the customer's bill.  *Id.* at ¶ 13.

24   The T-Mobile Carriers claim that "absent injunctive relief Plaintiffs will be obligated

25   to pay unlawful surcharges for all of their *tax-inclusive plans* . . . with a projected

26   impact of nearly $11 million *per month* in additional surcharges beyond Plaintiffs'

27

28

1 current level of surcharge remittances."  Plaintiffs' Mot. at 30 (emphasis in original)[6]

2 The T-Mobile Carriers further argue that "they will have to absorb the substantial

3 increased surcharge burden for these plans under the CPUC's new connections-based

4 rule." *Id.*, quoting Barnes Decl, ¶¶ 22, 25.  This argument fails to note, however, that

5 the Carriers need pay no surcharges at all, and most major carriers do not.

6       California has an all-end-user surcharge.  *See* Decision at 11.  ("The

7 Commission adopted an intrastate revenue-based end-user surcharge mechanism in

8 Decisions (D.) 94-09-065 and D.96-10-066, which formed the foundation of the

9 Commission's surcharge mechanism to support the PPPs."); *TURN*, 26 F.Supp.2d

10 1208.  While some carriers have made a business decision to assume surcharges on

11 behalf of their customers, such as some of the Plaintiffs, California does not require

12 them to do so.  Nothing in the challenged Decision affects this.  Indeed, as the

13 Complaint notes—albeit in an opaque way—most wireless companies, including some

14 of the plaintiffs in this case, do not pay surcharges on their customers' behalf.  *See*

15 Compl. at ¶ 13 ("Some of Sprint's wireless plans are tax-inclusive, while others are

16 tax-exclusive. For the tax-exclusive plans (*as is usual for most wireless providers*),

17 taxes, fees, and surcharges are paid by the subscriber on top of the monthly price for

18 service.") (emphasis added).

19       Despite this, the T-Mobile Carriers assert that they "will be *obligated* to pay

20 unlawful surcharges" and that they "themselves will *have to* absorb the substantial

21 increased surcharge burden for these plans under the CPUC's new connections-based

22 rule." Mot. at 22 (citing Barnes Decl. at ¶¶ 22, 25) (emphasis added).  But the Carriers

23 cite no authority that requires them to offer these tax-inclusive plans—and there is

24

25 ───────────────

26 [6] The Wireless Carriers have offered a Declaration of John Barnes. The declaration states that Mr. Barnes is the "Senior Director – Tax of T-Mobile USA, Inc.  Barnes Decl., ¶ 1.  The Wireless Carriers rely on the Barnes Declaration in support of the alleged damages they will suffer on April 1, 2023 when the access line surcharge goes into effect.  The Commission can and will refute both the basis and the content of the Barnes Declaration.

27

28

───────────────

10

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

1  none.  Nor do they point to any contractual obligations that force them "to incur

2  [regulatory fees] as out-of-pocket costs."  Barnes Decl. at ¶ 26.[7]

3      To the extent that any of the T-Mobile Carriers choose to assume their

4  customers' surcharges, that self-inflicted injury cannot be fairly traceable to the

5  Commission's Decision.  *See Al-Otro-Lado v. Wolf*, 952 F .3d 999, 1008 (9th Cir.

6  2020).  The Carriers may structure their business plans as they choose, but California's

7  regulatory scheme should not bear the brunt of their decision.  (Indeed, the T-Mobile

8  Carriers that *do* offer "tax-exclusive" plans, cannot point to any economic harm that

9  they would suffer.)

10     The T-Mobile Carriers further argue that if the Decision goes into effect, they

11 "will suffer harm to their brands, hard-earned customer goodwill, and reputations."

12 Plaintiffs' Mot. at 23.  According to the Carriers, the harm will result from increased

13 financial harm on consumers of tax-exclusive wireless plans resulting in "customer

14 dissatisfaction and confusion" ultimately impairing wireless carriers' "brands,

15 consumer friendly reputations and goodwill."[8]  *Id*.  The Carriers also assert that the

16

17 _____

18 [7] Indeed, the Carriers' own websites bear this out.  For instance, T-Mobile's Terms and
   Conditions, which apply "between you and us, T-Mobile USA, Inc., and our controlled

19 subsidiaries, assignees, and agents" including "prepaid customers" (Culver Decl. at 14), states

20 that, regarding taxes, "[y]ou agree to pay all taxes and fees imposed by governments or
   governmental entities.  We may not give advance notice of changes to these charges." The

21 Terms and Conditions further allow T-Mobile to "change, limit, suspend or terminate your
   Service or this Agreement at any time" including those on a price-lock guaranteed Rate Plan

22 with respect to "add-on features, taxes, surcharges, fees, or charges for extra features or

23 Devices."  Culver Decl., Exh.1.  The other plaintiffs' websites are much the same.  *See* Culver
   Decl., Exh. 4.

24 [8] A Google search of "Assurance, Inc or T-Mobile customer satisfaction" produces a survey

25 of customer satisfaction.  Of the 284 reviews listed—each complete with written comments—
   a full eighty-six percent of those responding give the carrier a "One Star out of Five" rating.

26 Many of the commenters self-identify as poor or low-income and offer up a litany of
   complaints regarding the way they are treated, or in some cases completely ignored, by

27 Assurance and T-Mobile. *See* TrustPilot.com, Assurance Wireless Reviews, *available at*

28 https://www.trustpilot.com/review/assurancewireless.com (last visited Feb. 25, 2023).

1  new surcharge mechanism will make it more difficult for them to compete for

2  customers, costing them market share.  *Id.*

3          These claims are too speculative and attenuated to constitute irreparable injury

4  meriting injunctive relief—and are, moreover, illogical.  The surcharge will apply

5  evenly to every telephone customer in the State, no matter what service they use or

6  what provider they choose.  Wireless customers will be treated the same as wireline

7  customers, who will be treated the same as VoIP customers; a Sprint customer will be

8  treated the same as an AT&T customer, who will be treated the same as a Verizon

9  customer.  All telephone companies in California, including the Plaintiffs here, will be

10  subjected to the same market forces.  It is implausible to suppose that, as a result of a

11  flat, across-the-board surcharge applying to every telephone customer in California,

12  the T-Mobile Carriers will take some disproportionate hit to their reputation or to their

13  market share.  At a minimum, this is not an injury that is "certainly impending."  *Index*

14  *Newspapers*, 888 F.3d at 1024.

15          The T-Mobile Carriers have not, in sum, shown that they will suffer any harm

16  that is fairly traceable to the Commission's challenged Decision.  Because the Carriers

17  thus lack standing to sue, they have not clearly shown that they are likely to prevail on

18  the merits, or that there are serious questions going to the merits.  And, for the same

19  reason, they have not clearly shown that they will be irreparably injured in the absence

20  of an injunction.[2]

21

22

23

24

---

25  [2]  In any event, that the T-Mobile Carriers waited more than three months after the Decision

26  issued to file suit strongly indicates that, even had they suffered some injury here, the injury is
     not truly irreparable.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,* 762 F.2d 1374,

27  1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a
     lack of urgency and irreparable harm.").

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Federal law does not expressly pre-empt the Commission's Decision.**

The T-Mobile Carriers' principal claim on the merits is that 47 U.S.C. § 254(f) pre-empts California's access-line surcharge both facially and as applied.   The Court's "ultimate task in any preemption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 89 (1992)).

There are three types of pre-emption: field, express, and conflict. *See Arizona v. United States*, 567 U.S. 387, 399 (2012).  Field pre-emption occurs when Congress so occupies a given area of regulation as to completely preclude states from regulating in that area, even when the state regulation is complementary or gap-filling. *Id.* Congress may, under express pre-emption, affirmatively withdraw specified powers from the states. *Id.* And, under conflict pre-emption, state law must give way to federal law when it is literally impossible to comply with both, or when the state law stands as an obstacle to the fulfilment of the federal law's purpose. *Id.*

Federal law neither expressly pre-empts all state regulation nor occupies the field of telecommunication regulation.  To the contrary, in the Communications Act of 1934, 47 U.S.C. Section 151, *et seq.*, as amended, Congress carefully crafted the law to expressly authorize state regulation and limit preemption.  *See*, *e.g.*, *TURN*, 26 F.Supp.2d at 1213 (finding that "California clearly has the authority to adopt regulations concerning the manner in which telecommunications carriers should contribute to the provision of universal services").

The T-Mobile Carriers argue instead that the Commission's Decision to impose an access-line surcharge is expressly pre-empted by two provisions of Section 254(f). First, they argue that an access-line surcharge is "inconsistent" with the federal surcharge mechanism.  Plaintiffs' Mot. at 16.  Second, they argue that an access-line

1   surcharge would impermissibly discriminate against wireless carriers.  Plaintiffs' Mot.

2   at 19.  Both arguments fail.

3       Turning first to the inconsistency argument: the T-Mobile Carriers note that an

4   access-line charge is different than the federal surcharge mechanism, which is true.

5   They then go on to argue that any state mechanism that differs from the federal

6   mechanism is thus inconsistent with it, which is false.  *See* Plaintiffs' Mot. at 17 ("The

7   inconsistency between the CPUC's new rule and the FCC's rules is evident from the

8   indisputable fact that the CPUC's approach diverges from the FCC's.").  State

9   universal service funding mechanisms can and do diverge from the FCC's methods

10   without inconsistency.  Indeed, this Court has already held that such a divergent state

11   mechanism is not inconsistent with the federal rules under the meaning of Section

12   254(f).

13       In *Utility Reform Network v. California Public Utilities Commission*, a

14   consumer group challenged the Commission's imposition of an all end-user surcharge.

15   *TURN*, 26 F.Supp.2d at 1210-11.  Because Section 254(f) requires telecommunications

16   carriers—not end users—to "contribute" to the "to the preservation and advancement

17   of universal service" in the states, and because the FCC had interpreted an analogous

18   section of the '96 Act, 47 U.S.C. § 254(d), to require carriers rather than end users to

19   pay into the federal fund, the consumer group argued that California's end-user

20   surcharge was "inconsistent with" the FCC's rules.  *TURN*, 26 F.Supp.2d at 1214.

21       This Court disagreed.  The Court noted that, rather than forbidding the states

22   from imposing an end-user surcharge, the FCC had engaged in "extensive discussion

23   of economic policy and State discretion in regulating rates," which would be

24   "superfluous, if not irrelevant" if the FCC believed an end-user surcharge to be flatly

25   prohibited.  *Id.* at 1215.  Moreover, the Court found that the legislative history of the

26   '96 Act refuted the consumer group's argument that state funding mechanisms must

27   proceed in lockstep with the federal mechanism: Congress, when enacting Section

28

254, did not "presume that any particular existing mechanism for universal service support must be maintained or discontinued."  *Id.* (quoting S. Rep. No. 104-23, at 57 (1995)).  *See also MetroPCS Cal. v. Picker*, 970 F.3d at 1106 (rejecting facial challenge to state funding mechanism that differed from federal mechanism).  Because California had imposed an end-user surcharge to fund certain low-income services before the passage of the '96 Act, "[t]he legislative history . . . therefore refutes [the] assertion that Congress intended to require telecommunications carriers, not end-users, to fund universal access services . . . ."  *TURN*, 26 F.Supp.2d at 1215.

As the T-Mobile Carriers note, the FCC has long debated whether an access-line surcharge is preferable to a revenue-based surcharge.  *See* Plaintiffs' Mot. at 17.  Yet in all that time, the FCC has never asserted that states may not impose an end-user surcharge, or that such a surcharge would be "inconsistent with" the federal rules, and the T-Mobile Carriers do not claim that it has.  Many states fund their Universal Service programs through some method other than the revenue-based mechanism that the FCC uses to fund the federal USF.  *See* Sherry Lichtenberg, Ph.D., National Regulatory Research Institute, *State Universal Service Funds 2018: Updating the Numbers* at 2 (April 2019), *available at* https://pubs.naruc.org/pub/3EA33142-00AE-EBB0-0F97-C5B0A24F755A.   Some of these state mechanisms have been in place for a long time: for example, the State of Arizona has used access-line surcharges since 1989.  *See Application of the Ariz. Tel. Co. for Approval of the Ariz. Util. Plan*, D56639, at 18 (Ariz. Corp. Comm'n Sept. 22, 1989) ("For local service, the amount collected from each local exchange carrier would be based on access lines in service."), *available at* https://docket.images.azcc.gov/H000002736.pdf?i=1677447994043.[10]  The FCC

---

[10] Arizona still partly funds its Universal Service Fund via an access-line surcharge.  *See* Ariz. Corp. Comm'n, *Arizona Universal Service Fund – High Cost Fund*, *available at*

1    certainly should "be expected to monitor, on a continuing basis" state and local laws

2    that directly impact of the goals of existing programs.  *Hillsborough Cnty. v.*

3    *Automated Med. Labs., Inc.*, 471 U.S. 707, 721 (1985).  The fact that it has never so

4    much as suggested that an access-line surcharge (let alone, as the T-Mobile Carriers

5    would have it, any state rule that differs from the federal rules in any way) would

6    contradict the federal mechanism strongly indicates that it believes such a surcharge to

7    be consistent with the federal rule.

8         Likewise, because in 1995 at least one state, Arizona, imposed access-line

9    surcharges, the Carriers' claim that Congress intended to forbid such surcharges is

10   unsupportable.  In drafting the '96 Act, Congress was aware that the states were

11   experimenting with different approaches and chose to let that experimentation flourish

12   rather than cutting it off.  *See TURN*, 26 F.Supp.2d at 1215-16.  The T-Mobile

13   Carriers' argument that an access-line surcharge is necessarily inconsistent with

14   federal law fails.[11]

15        Their argument that an access-line charge discriminates against them fares no

16   better.  As the Carriers assert, Section 254(f) requires the states to impose their

17   surcharges "on an equitable and nondiscriminatory basis," which means that the state

18   rules must neither favor one provider or another, nor one technology over another,

19   applying instead in a competitively-neutral way.  *MetroPCS Cal. v. Picker*, 970 F.3d at

20   1120.  The crux of the T-Mobile Carriers' argument is that they derive the bulk of their

21   revenues from interstate and non-surchargeable services, as opposed to traditional

22   wireline carriers, which derive the bulk of their revenues from surchargeable intrastate

23

24   _____

25   https://webuat.azcc.gov/utilities/telephone/arizona-universal-service-fund (last visited Feb.
     26, 2023).

26   [11] The Wireless Carriers also argue, briefly, that the access-line surcharge conflicts with
     Section 254(f).  Plaintiffs' Mot. at 17-18, fn. 14.  Because that argument, like their express
27   pre-emption argument, starts from a mistaken premise—that federal law requires all state
     rules to mirror the federal rules—its conclusion is similarly flawed.

28

1    services.  Plaintiffs' Mot. at 20.  The T-Mobile Carriers thus argue that charging on the

2    basis of access lines as opposed to surchargeable intrastate revenue will require them

3    to pay a higher relative surcharge burden than traditional wireline carriers.  *See Id.* at

4    21 ("[T]he surcharge burden for Plaintiffs under the new rule will be much higher than

5    that for LECs, relative to Plaintiffs' small percentages of revenues from intrastate

6    telecommunications service.").

7         To reiterate: the T-Mobile Carriers don't have to pay the surcharge.  Neither do

8    traditional wireline carriers.  Nor do VoIP providers.  In California, the surcharge

9    burden falls on the end user; the T-Mobile Carriers have no surcharge burden.  And all

10   end users pay alike, no matter what provider they use, and no matter what the

11   underlying technology.  Accordingly, how could California's surcharge rule

12   discriminate against the T-Mobile Carriers?

13        As the Commission found in its challenged Decision, "[a] single flat rate end

14   user surcharge mechanism will allow each carrier, regardless of the technology mode

15   (*e.g.*, VoIP or wireless) or business model (*e.g.*, prepaid or postpaid), to collect and

16   remit PPP surcharges based on one standard—the number of access lines each

17   provider operates."  Decision at 28; *see also*, *e.g.*, *id.* at 35 ("[W]ith the per access line

18   surcharge mechanism, all users (residential, small business, large business) and all

19   service types would pay the same amount.  This would result in a more equitable

20   assessment of the current PPP surcharges . . . .").  In other words, the Commission

21   expressly crafted a surcharge mechanism that will not discriminate against any

22   provider or type of service: all will be treated equally.  That the T-Mobile Carriers may

23   be unequally *affected* is the result of their own choices, not the Commission's

24   Decision.  The Carriers' discrimination argument fails.

25

26

27

28

**III.    Because the T-Mobile Carriers seek to suborn California's regulatory scheme to their private interests, the balance of equities and the public interest tip sharply against them.**

The balance of equities requires weighing the "competing claims of injury" and considers "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  And while the balance of equities focuses on the parties, "the public interest inquiry primarily addresses impact on non-parties rather than parties," and takes into consideration "the public consequences in employing the extraordinary remedy of injunction." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (quoting *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931-32 (9th Cir. 2003)).  In analyzing the public interest required to grant a preliminary injunction, courts recognize that the public is benefited by the efficient administration of justice and enforcement of the law.  *US Auto Parts Network*, *Inc.*, *v. United States*, 319 F. Supp. 3d. 1303 (Ct. Int'l Trade 2018).  This is particularly relevant to the work of administrative agencies.  *See e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d. 317 (D.D.C 2018).  To succeed at securing an injunction, the T-Mobile Carriers must show that the balance of equities and the public interest tip in their favor.  *Winter*, 555 U.S. at 20. As set forth below, the T-Mobile Carriers have not done so.

Plaintiffs contend that "injunctive relief will forestall the severe burdens and inequitable impacts that the connections-based rule would otherwise inflict upon lower-income households (the majority of wireless households), especially those from communities that have been disproportionately affected by the economic shocks of the COVID-19 pandemic and historic levels of inflation" and that "preserving the status quo while the Court resolves the merits of Plaintiffs' claims will do no harm to the CPUC or its Universal Service programs."  Plaintiffs' Mot. at 24-25.  The underlying record in the Commission's proceeding counters these unsupported claims.

Maintaining the status quo in California would make California's universal service programs unsustainable, including California's LifeLine program, which

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

provides affordable telephone service to low-income Californians.  Doing nothing to address the declining revenue surcharge base to support universal service would also continue to give these T-Mobile Carriers a competitive advantage over wireline carriers, whose customers, under the revenue mechanism, have been forced to pay more than wireless customers to support the state's universal service programs.

For example, in the underlying Commission rulemaking, wireline carriers generally supported the Commission's proposal to adopt an access line-based surcharge mechanism because it would "more equitably allocate the burden of funding the PPPs."  *See*, *e.g.*, Consolidated Communications of California Company, *Reply Comments on Order Instituting Rulemaking* at 1 (April 23, 2021), *available at* https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M379/K995/379995102.PDF; *see also generally* Small LECs[12] *Reply Comments on Order Instituting Rulemaking* (April 23, 2021), *available at* https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M378/K738/378738299.PDF. Responding specifically to objections from wireless carriers, Consolidated Communications of California noted the existing inequities with the revenue-based support mechanism:

> Wireless carriers comment that the proposal would significantly increase the PPP surcharges paid by their customers.  However, wireline customers have carried that burden for years as the revenue designated as assessable by the wireless carriers for voice service that is a substitute for wireline voice service has been disproportionally minimized. Applying the surcharge recovery to access lines will eliminate this discrepancy, which will only grow in the future if not addressed. As wireless voice service continues to supplant

_____

[12] The small LECs consist of the following wireline companies: Calaveras Telephone Company, Cal-Ore Telephone Co., Ducor Telephone Company, Foresthill Telephone Co., Happy Valley Telephone Company, Hornitos Telephone Company, Kerman Telephone Co., Pinnacles Telephone Co., The Ponderosa Telephone Co., Sierra Telephone Company, Inc., The Siskiyou Telephone Company, Volcano Telephone Company, Winterhaven Telephone Company.

1
2

> wireline voice service, it is appropriate that wireless
> customers bear a larger, more equitable portion of the PPP
> obligation.

3
4

Consolidated Communications of California Company, *Reply Comments on Order Instituting Rulemaking* at 1.

5

The Small LECs provided a similar rebuttal to wireless carriers' comments:

6
7
8
9
10
11
12
13

> CTIA and Verizon strongly oppose the new surcharge
> proposal based on their view that it would increase the PPP
> surcharges paid by wireless customers. While the proposed
> reform may cause increases to wireless customer surcharges, it
> would more evenly and equitably distribute the surcharges
> paid by all voice communications customers on a
> competitively neutral basis. The Small LECs support this more
> equitable approach, which would likely result in an
> appropriate decrease in surcharges paid by their rural
> customers, many of whom have limited or fixed incomes,
> including elderly, farmworkers and struggling small
> businesses.

14
15

Small LECs *Reply Comments on Order Instituting Rulemaking* at 2 (footnotes omitted).

16
17
18
19
20

Nor did comments in support of the access-line charge come only from traditional wireline telephone companies.  Frontier Communications, for example, stated that transitioning from a revenue-based mechanism to an access-line surcharge "is the only proposal that is likely to provide a viable, long-term solution to the declining intrastate billing base for the PPP surcharges."  Decision at 24.

21
22
23
24
25
26

As to the interests of low-income customers, in adopting the access line mechanism the Commission did take this population of customers into account.  *See* Decision at 36-39.  The Commission also addressed concerns about incarcerated persons.  *Id.*  The Commission concluded that LifeLine subscribers and incarcerated persons should be exempt from paying the new access line-based surcharge, explaining:

27
28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

1

2

3

4

5

6

7

8

9

> The Commission already exempts individuals enrolled in the LifeLine PPP program from paying PPP surcharges and user fees, and this policy will not change. Although Greenlining proposes to wrap LifeLine eligible individuals currently not enrolled into the exemption, the Commission agrees with comments filed by the Small LECs and other parties that this would impose additional administrative burden to implement and does not appear feasible to implement.
>
> Incarcerated individuals represent a special population eligible for attention. The Commission is persuaded by parties' comments to exempt incarcerated individuals from the PPP surcharge mechanism and from paying the user fee.

10

*Id.* at 39.

11

    As the record in the underlying proceeding demonstrates, the Commission

12

appropriately balanced the interests at stake in exercising its broad state authority to

13

adopt an access line financing mechanism that would stabilize the support needed for

14

California's universal service programs, as well as to make it more technology neutral

15

in application.

16

    Finally, in an attempt to demonstrate that the new surcharge is unnecessary, the

17

T-Mobile Carriers mischaracterize the availability of "substantial Universal Service

18

funding available to California under recent federal legislation."  Plaintiff's Mot. at 13.

19

The programs they cite primarily fund infrastructure, not services.[13]  Those programs

20

therefore have no relevance to five of California's six PPPs.

21

    The T-Mobile Carriers seek to avoid the consequences of their own business

22

decisions.  They would do so by attacking a well-supported administrative process in

23

which the Commission weighed a number of competing financial and social factors,

24

and comments from a range of parties, and concluded, on balance, that an access-line

25

surcharge better fits California's needs than a revenue-based surcharge.  What the

26

27

[13] *See*, https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/broadband-implementation-for-california and https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/broadband-implementation-for-california/bead-program.

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB

Carriers now seek in federal court is to reformulate the entire state Universal Service surcharge structure around their tax-inclusive business model, and they do so by cloaking their private concern in the language of equity and solicitude for low-income Californians. This Court should not indulge this stratagem.

Even assuming for the sake of argument that the T-Mobile Carriers were likely to succeed on the merits of this proceeding, or that they had demonstrated irreparable harm, because the balance of the equities and the public interest tip sharply against the Carriers, their motion should be denied.

## IV.  The Motion suffers from several procedural defects.

### A.  Objection to the Declaration of John Barnes.

In addition to the motion's substantive flaws, it suffers from several procedural defects. First, while this Court does have discretion to consider inadmissible evidence in this posture, *see*, *e.g.*, *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984), given that the Decision has been final since October, this Court should not do so here. Pursuant to Local Rule 7-3(a) and 7-5(b), the Commission objects to the Declaration of John Barnes (ECF 4-14). The Commission objects to Paragraph 16 on the grounds that it lacks foundation. Fed. R. Evid. 602. The declarant has not explained the basis or source of the figures, and for that reason the statement may also be hearsay. Fed. R. Evid. 802. The Commission objects to Paragraph 21 on the grounds that it is an improper legal opinion. Fed. R. Evid. 701. The Commission objects to Paragraph 26 as speculative. Fed. R. Evid. 602, 701. The declarant cannot know that its market share will decrease, particularly where Plaintiffs' competitors are also subject to the Decision. The Commission objects to Paragraphs 31-32 and 34-37 as lacking in foundation and constituting speculation and improper opinion evidence. Fed. R. Evid. 602, 701. The declarant's opinions about what may happen, particularly where the entire wireless industry is also subject to the Decision, cannot be credited. In addition to the foregoing objections, the Commission requests that Mr. Barnes

present himself at the Zoom hearing on the Motion set for March 16, 2023, at 9:30 am and make himself available for cross-examination, as this Court has the discretion to require.  L.R. 7-6.

### B.      The T-Mobile carriers have not posted a bond pursuant to Fed. R. Civ. P. 65(c).

Fed. R. Civ. P. 65(c) enables a court to issue a preliminary injunction only if the party seeking the injunction gives security in an amount the court deems sufficient to pay costs and damages sustained by the party the court finds was injured.  The bonding requirement can be waived under Fed. R. Civ. P. 65(c) if a party is unable to post a substantial bond.  *See People of the State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1995).  The T-Mobile Carriers are clearly capable of posting a bond in this matter.  Payment of a bond would ameliorate any putative hardship to the Commission.  They have not done so and this Court should require a bond under these circumstances.

### Conclusion

Because the T-Mobile Carriers have not clearly demonstrated themselves to be entitled to a preliminary injunction, the Commission respectfully asks the Court to deny the motion.  The Commission further requests pursuant to Rule 43(c) of the

/ / /

/ / /

/ / /

Federal Rules of Civil Procedure and L.R. 7-6 that Declarant John Barnes be available for cross-examination on the date set for hearing in this matter.

Date: February 27, 2023

Respectfully submitted,

CHRISTINE J. HAMMOND
JONATHAN KOLTZ
DAVID W. FERMINO
IAN P. CULVER
VANESSA BALDWIN

By:    /s/    DAVID W. FERMINO
_____
DAVID W. FERMINO

505 Van Ness Ave.
San Francisco, CA 94102
Telephone: 415-696-7359

*Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-CV-00483-LB