Peter Karanjia (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
500 8th Street, NW
Washington, D.C. 20004
Tel.:    (202) 799-4000
Email: peter.karanjia@us.dlapiper.com

Kathleen S. Kizer (SBN 246035)
**DLA PIPER LLP (US)**
500 Mission Street, Suite 2400
San Francisco, CA 94105
Tel.:    (415) 836-2500
Email: kathy.kizer@us.dlapiper.com

Ben Fabens-Lassen (SBN 348874)
Gaspard Rappoport (SBN 340335)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Tel.:    (310) 595-3000
Email: ben.fabens-lassen@us.dlapiper.com
Email: gaspard.rappoport@us.dlapiper.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ASSURANCE WIRELESS USA, L.P.; METROPCS CALIFORNIA, LLC; SPRINT SPECTRUM LLC; T-MOBILE USA, INC.; and T-MOBILE WEST LLC, | Case No. 3:23-cv-00483-LB |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |
| ALICE B. REYNOLDS, President of the California Public Utilities Commission, in her official capacity, et al., | Date:         March 16, 2023<br>Time:         9:30 a.m.<br>Courtroom: Courtroom B, 15th Floor |
| Defendants. | Complaint Filed: February 1, 2023 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

   I.   Plaintiffs Clearly Have Standing. ............................................................................ 2

   II.  Plaintiffs Are Likely to Succeed on the Merits of Their Preemption Claims. ..................... 5

       A.   The CPUC Rule Is "Inconsistent With" FCC Rules. ................................................. 6

       B.   The CPUC's Rule Unfairly Discriminates Against Plaintiffs Relative to LECs. ... 11

       C.   The CPUC Rule Unfairly Discriminates Against Assurance and MetroPCS. ........ 13

   III. Plaintiffs Will Suffer Irreparable Injury Absent Injunctive Relief. .................................. 13

   IV. The Balance of Equities and Public Interest Weigh in Favor of Granting Relief. .............. 14

   V.  There is No Reason to Require a Bond. ................................................................. 15

CONCLUSION .................................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................... 6

*AT&T Commc'ns, Inc. v. Eachus*,
  174 F. Supp. 2d 1119 (D. Or. 2001)......................................................... 6

*AT&T Corp. v. PUC of Tex.*,
  373 F.3d 641 (5th Cir. 2004)..................................................................... 12

*Bacchus Imps., Ltd. v. Dias*,
  468 U.S. 263 (1983) ................................................................................. 5

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003)..................................................................... 15

*City of Arlington, Tex. v. FCC*,
  569 U.S. 290 (2013) ................................................................................. 7

*Decker v. Nw. Env't. Def. Ctr.*,
  568 U.S. 597 (2013) ................................................................................. 6

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017)..................................................................... 4

*Ecological Rts. Found. v. PG&E Co.*,
  874 F.3d 1083 (9th Cir. 2017)................................................................... 6, 7

*Fid. Nat'l. Title Ins. Co. v. Castle*,
  2011 WL 5882878 (N.D. Cal. Nov. 23, 2011)......................................... 14

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984)................................................................... 14

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ................................................................................. 11

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000)................................................................... 15

*Haro v. Sebelius*,
  747 F.3d 1099 (9th Cir. 2014)................................................................... 2

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013)................................................................... 14

ii

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

*Immigrant Legal Res. Ctr. v. Wolf*,
    491 F. Supp. 3d 520 (N.D. Cal. 2020). .................................................................. 15

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ........................................................................... 1, 2

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 3

*MetroPCS Cal., LLC. v. Batjer*,
    2021 WL 4311468 (N.D. Cal. Sept. 22, 2021) ..................................................... 12

*MetroPCS Cal., LLC v. Picker*,
    970 F.3d 1106 (9th Cir. 2020) .................................................................. 9, 12, 13

*Mortg. Elec. Registration Sys., Inc. v. Robinson*,
    2015 WL 993319 (C.D. Cal. Feb. 27, 2015) .......................................................... 4

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ............................................................................... 7

*Nat'l Meat Ass'n v. Deukmejian*,
    743 F.2d 656 (9th Cir. 1984) .............................................................................. 5

*Oakland Trib., Inc. v. Chron. Publ'g Co., Inc.*,
    762 F.2d 1374 (9th Cir. 1985) ........................................................................... 14

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) .............................................................................. 6

*Persian Gulf Inc. v. BP W. Coast Prod. LLC*,
    2022 WL 4830698 (S.D. Cal. Sept. 30, 2022) ................................................. 13, 14

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016) .......................................................................................... 7

*Repub. of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ........................................................................... 14

*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*,
    29 F.4th 542 (9th Cir. 2022) .............................................................................. 7

*Salton Sea Venture, Inc. v. Ramsey*,
    2011 WL 4945072 (S.D. Cal. Oct. 18, 2011) ....................................................... 14

*Sprint Nextel Corp. v. Middle Man, Inc.*,
    822 F.3d 524 (10th Cir. 2016) ............................................................................ 4

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
    695 F.3d 676 (7th Cir. 2012) .............................................................................. 4

iii

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ................................................................. 8

*U.S. WeChat Users All. v. Trump*,
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ............................................ 2, 14

*United States Telecom Ass'n, v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ............................................................. 7

*Util. Reform Network v. CPUC*,
    26 F. Supp. 2d 1208 (N.D. Cal. 1997) .......................................... 7, 8, 9

*Verizon Md., Inc. v. Pub. Serv. Comm'n*,
    535 U.S. 635 (2002) ............................................................................. 9

**Statutes**

47 U.S.C. § 254 ............................................................................................. 6

47 U.S.C. § 254(f) ................................................................................ *passim*

47 U.S.C. § 225 ............................................................................................. 9

A.A.C. R14-2-A1204(B) ............................................................................. 10

220 Ill. Comp. Stat. 5/13-703(c) ................................................................... 9

Iowa Code §§ 477C.3, 477C.7 ...................................................................... 9

Minn. Stat § 237.52 ....................................................................................... 9

Miss. Code Ann. §§ 77-3-505, 507 ................................................................ 9

N.C. Gen. Stat. § 62-157 ................................................................................ 9

N.D. Cent. Code §§ 54-44.8-03, 8-08 ........................................................... 9

N.H. Code Admin. R. Ann. PUC 404.09 ...................................................... 9

Ohio Rev. Code Ann. § 4905.8 ..................................................................... 9

Ohio Admin. Code 4901:1-6-36 .................................................................... 9

S.D. Codified Laws § 49-31-51 ..................................................................... 9

S.D. Admin. R. 20:10:32:10 .......................................................................... 9

S.D. Admin. R. 20:10:32:10 .......................................................................... 9

Utah Admin. Code R746-8-301(1)(e)(ii) ..................................................... 10

iv

## Administrative Decisions

*Application of Arizona Telephone Company for Approval of the Arizona Utility Plan*, Decision No. 56639 (Ariz. Corp. Comm. Sept. 22, 1989) ............................................ 10

*CPUC Petition for Delegation of Additional Auth. Pertaining to Area Code Relief & Nxx Code Conservation Measures*, 14 FCC Rcd. 17486 (1999) ........................................ 12

*Fed.-State Joint Bd. on Universal Serv.*,
12 FCC Rcd. 8776 (1997) ........................................................................................ 8

*Fed.-State Joint Bd. on Universal Serv.*,
15 FCC Rcd 15168 (2000) ..................................................................................... 12

*Guidelines on the Collection Reporting and Remittance of CPUC Public Purpose Program Surcharges and User Fees for Prepaid Wireless Services Sold in California*, 2018 Cal. PUC LEXIS 606 (Cal. P.U.C. December 13, 2018) ............................ 3

*In re Dual Party Relay Serv. Monthly Maintenance Surcharge*,
No. 1990-UA-156 (Miss. Pub. Serv. Comm'n Oct. 5, 2017) ...................................... 9

*In the Matter of the Nebraska Public Service Commission*
Decision No. NUSF-119/PI-233, 2021 WL 1987277 (NE PSC May 11, 2021) .................... 10

*Notice of Proposed Amends. to the Arizona Universal Serv. Fund*,
No. 78817, 2022 WL 17902753 (Arizona Corp. Comm. Dec. 15, 2022) .......................... 10

*Petition of Network Commc'ns Int'l Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c)*, 35 FCC Rcd. 8348 (2020) ..................................................................... 12

*Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ............................ 7, 9, 11

*Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018). ........................................... 7, 9, 11

*Universal Serv. Contribution Methodology: A Nat'l Broadband Plan for Our Future*, 27 FCC Rcd. 5357 (2012) ....................................................................... 9

## Regulations

47 C.F.R. § 54.709 .................................................................................................. 8

47 C.F.R. § 64.604(c)(5)(iii) .................................................................................... 9

## INTRODUCTION

In its Opposition to Plaintiffs' preliminary injunction motion, the CPUC doubles down on its disregard for the severe inequitable impacts of its surcharge overhaul. Not only does the CPUC ignore the serious concerns that consumer groups—and civil rights groups appearing as *amici* before this Court—have expressed about the connections-based rule, it goes one step further: Advancing a meritless standing argument, the CPUC tells Plaintiffs that they can and should shift the massive financial impact of the new rule (a burden that the CPUC does not dispute will exceed $130 million per year) entirely to their customers, including low-income consumers who rely on Plaintiffs' wireless services as their only means of accessing the Internet.

The CPUC's position is as legally indefensible as it is inequitable. Plaintiffs are wireless carriers that are the "direct object" of the CPUC's new rule, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011), and thus have standing to challenge it. The CPUC's unsupported assertion that Plaintiffs will suffer no Article III injury because they supposedly can simply foist the new rule's financial burden upon their customers is contrary to precedent recognizing that service providers have standing to challenge fees and taxes even when those fees and taxes are fully passed through to customers. It also ignores a binding commitment that T-Mobile has made to the State of California to offer the same (or better) customer rate plans until April 2025. This commitment prevents Plaintiffs from adopting the CPUC's illusory solution to the significant and direct harm Plaintiffs will suffer as a result of the new rule: abandoning their extremely popular, pro-consumer business model of offering consumers tax-inclusive wireless plans (*i.e.*, plans that include all taxes, surcharges, and fees in an "all in" sales price) and shifting millions of dollars in additional surcharges to their customers. In any event, any such drastic change would be highly disruptive to Plaintiffs' business model—a model that has been instrumental to Plaintiffs' success in the marketplace—causing Plaintiffs further and irreparable harms.

Beyond its baseless standing argument, the CPUC's Opposition largely ignores Plaintiffs' arguments showing likelihood of success on the merits. The CPUC fails to engage with the text of Section 254(f) of the Communications Act—the express preemption provision at the center of this case—and ignores the precedent Plaintiffs cited explaining the meaning of that provision's

1

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

prohibition of state Universal Service rules that are "inconsistent with" the FCC's counterpart rules. For Plaintiffs' competitive-neutrality claims, the CPUC has little to say except to recycle its flawed theory that Plaintiffs somehow lack standing to bring this case.

The CPUC fares no better when addressing irreparable harm. Rather than presenting facts to refute Plaintiffs' showing that the connections-based rule will irreparably harm Plaintiffs in multiple ways—including exposing them to nearly $11 million per month in unrecoverable losses, plus market share erosion, reputational harm, and loss of customer goodwill—the CPUC attempts to erect another procedural roadblock: It asks the Court to disregard portions of the sworn declaration supporting Plaintiffs' motion based on the theory that the declaration contains hearsay and other purported defects. This Court has rejected similar ploys before and should do so again here. *See U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 917 n.7 (N.D. Cal. 2020).

Finally, the CPUC has no answer to the serious public-interest harms inflicted by its rule. Nor does the CPUC deny that it will not suffer *any* prejudice or harm if a preliminary injunction is granted to maintain the status quo while this Court resolves the merits of Plaintiffs' claims. The CPUC's rule is unlawful, inequitable, and should be preliminarily enjoined.

## ARGUMENT

## I. Plaintiffs Clearly Have Standing.

To avoid the merits of Plaintiffs' preemption claims, the CPUC maintains that Plaintiffs somehow lack standing to bring this action. This argument is baseless.

Plaintiffs have standing because they are the "direct object" of the CPUC's mandatory connections-based rule. "[A] plaintiff is presumed to have constitutional standing to seek injunctive relief when [it] is the direct object of [government] action challenged as unlawful." *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014) (quoting *L.A. Haven Hospice*, 638 F.3d at 655). Here, the CPUC's Decision explicitly states that all "*wireless … carriers **must*** assess surcharges using the new mechanism" and that "*[a]ll telephone corporations, including ... wireless … carriers or providers, **shall*** implement the new access line flat rate surcharge collection and remittance mechanism adopted in this decision, beginning April 1, 2023." Decision at 59-60, 76 (emphasis

2

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

added).[1] The CPUC does not and cannot dispute that Plaintiffs are "wireless carriers" and "telephone corporations" that are obligated to comply with the rule; nor can it dispute that Plaintiffs could be exposed to penalties for failing to implement the rule in the manner and at the time directed.

The presumption of standing thus applies, and the CPUC cannot overcome it. Plaintiffs satisfy all three elements of Article III standing—establishing (1) a concrete injury, (2) fairly traceable to the defendants' challenged action, (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

*First*, the Decision will subject Plaintiffs and their customers to concrete, demonstrable economic injury, as well as reputational harm, loss of market share, and loss of customer goodwill. *See* PI Br. at 22-24; Barnes Decl. ¶¶ 18-37. With respect to Plaintiffs' tax-inclusive plans (*i.e.*, "all-in" plans that include all taxes, fees, and surcharges at a fixed monthly rate plan price), Plaintiffs conservatively project that they will be required to remit more than $130 million in additional annual surcharges, which in turn will make it more difficult for Plaintiffs to compete for customers in a highly competitive marketplace. Barnes Decl. ¶ 25. And for Plaintiffs' tax-exclusive plans (under which customers pay taxes, fees, and surcharges in addition to a monthly rate plan price), Plaintiffs will suffer reputational harm and erosion of market share when their customers react to the new connections-based rule's imposition of millions of dollars in additional monthly fees. *Id.* ¶¶ 27-37. *Second*, these harms are "fairly traceable" to the CPUC's new rule. But for that rule, Plaintiffs and their customers would not be subjected to the astronomical increases in surcharges, and there would be none of the serious harms that result from it. *And third*, granting the requested relief would clearly redress Plaintiffs' injuries, because if the rule is found to be preempted by federal law, Plaintiffs and their customers would not be required to pay millions of dollars more in unlawful surcharges.

The CPUC does not refute these facts. Instead, it argues that Plaintiffs' consumer-friendly, tax-inclusive business model gives rise to a "self-inflicted injury" that is supposedly not "traceable" to the CPUC's new rule. Opp. at 11. That is wrong as a matter of law. It is well-established that "[a]n

---

[1] The CPUC has also recently admonished that "[p]repaid wireless carriers shall remain ultimately responsible for the surcharges and user fees collected based on all sales of prepaid wireless service, including both direct and indirect sales." *Guidelines on the Collection Reporting and Remittance of CPUC Public Purpose Program Surcharges and User Fees for Prepaid Wireless Services Sold in California*, 2018 Cal. PUC LEXIS 606, *44 (Cal. P.U.C. December 13, 2018).

action that threatens an entity's business model"—such as Plaintiffs' tax-inclusive model here—"constitutes sufficient injury for purposes of Article III standing." *Mortg. Elec. Registration Sys., Inc. v. Robinson*, 2015 WL 993319, at *4 (C.D. Cal. Feb. 27, 2015), *aff'd*, 671 F. App'x 562 (9th Cir. 2016); *Sprint Nextel Corp. v. Middle Man, Inc*., 822 F.3d 524, 528-29 (10th Cir. 2016) (finding standing where challenged ruling "would interfere with [the party's] alleged business model"); *Stuller, Inc. v. Steak N Shake Enters., Inc*., 695 F.3d 676, 680 (7th Cir. 2012) (affirming preliminary injunction because policy requiring "a significant change to [a party's] business model" constitutes irreparable harm); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) ("undermin[ing]" a company's "business model" is irreparable harm).

Moreover, the CPUC's argument is that Plaintiffs lack standing because they pay surcharges directly for tax-inclusive customers, rather than passing those fees on to those customers. The clear implication is that Plaintiffs can and should attempt to avoid the serious harms inflicted by the connections-based rule by abandoning their extremely popular tax-inclusive model and passing on millions of dollars in surcharges to their customers. *See* Opp. at 1, 11. The CPUC, however, ignores or is unaware of T-Mobile's binding commitment to the California Attorney General (as part of a settlement of an antitrust challenge to the 2020 T-Mobile/Sprint merger) that it will "make available in the State of California" until April 2025 "the same or better smartphone consumer rate plans" that were offered in 2019 (*i.e.*, including tax-inclusive plans).[2] That commitment bars Plaintiffs from suddenly abandoning their existing tax-inclusive plans (at least for Plaintiffs T-Mobile and Sprint).

The CPUC also ignores the practical reality that suddenly pivoting to a 100% tax-exclusive business model *for millions of California customers* would be hugely disruptive and inevitably expose Plaintiffs to significant *additional* harms in the form of substantial implementation and transition costs, as well as inevitable loss of business and customer goodwill when dissatisfied customers suddenly have to pay monthly surcharges on top of their wireless service plan price. *See* Barnes Decl. ¶¶ 31-37. For this reason, the CPUC is wrong when it suggests that there can be no competitive harm to Plaintiffs because other service providers will also have to implement the

---

[2] *See* Settlement Agreement and Release of Claims at 2, https://oag.ca.gov/system/files/attachments/press-docs/CA%20Settlement%20Agreement%20%283.9%20fully%20executed%29.pdf.

connections-based rule. *See* Opp. at 12. As the CPUC acknowledges (*id.* at 10), most of Plaintiffs' competitors already charge their customers surcharges on top of the price of service. Thus, it makes sense that the bill shock resulting from the connections-based rule will be especially acute for Plaintiffs' tax-inclusive customers—who, after becoming accustomed to not having to pay any surcharges or fees on top of the price of their wireless plans, would suddenly have to pay an additional $1.11 per month. The same is not true for most of Plaintiffs' competitors.

The CPUC also incorrectly assumes that if Plaintiffs did abandon their tax-inclusive model in favor of a 100% tax-exclusive model, that would eliminate any cognizable injury for Article III purposes. Not so. A substantial body of law establishes that service providers have standing to challenge fees and taxes even when those fees and taxes are passed on to their customers. *See, e.g.*, *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 267 (1983) (standing to challenge discriminatory assessment that had "an adverse competitive impact on [plaintiffs'] business"; even if the assessment was "completely and successfully passed on [to plaintiffs' customers], it increas[ed] the price of [plaintiffs'] products as compared to the exempted [products]"); *Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656, 661 n.3 (9th Cir. 1984), *aff'd*, 469 U.S. 1100 (1985).

Finally, even if the CPUC's "self-inflicted" injury theory had merit (and it does not), the CPUC ignores the fact that Plaintiffs offer tax-exclusive plans to millions of California customers. *See* Barnes Decl. ¶¶ 12-13. Thus, even under the CPUC's flawed logic, the harm is not "self-inflicted" because Plaintiffs do pass through surcharges for these plans.[3] Plaintiffs clearly have standing.

## II. Plaintiffs Are Likely to Succeed on the Merits of Their Preemption Claims.

Plaintiffs have provided the Court with three *independent* grounds on which they are likely to

---

[3] Without introducing any contrary evidence, the CPUC attempts to dismiss as "speculative" the evidence from Mr. Barnes regarding reputational harms, loss of market share, and loss of customer goodwill (Opp. at 12), but there is nothing speculative about Mr. Barnes's sworn testimony based on his personal knowledge and many years of experience in the wireless industry. As Mr. Barnes explained, "[i]n Plaintiffs' experience, as costs to consumers rise due to increases in regulatory fees, some consumers view the service providers (as opposed to state regulators) as being somehow responsible for those costs, and thus view the providers less favorably." Barnes Decl. ¶ 31. As a result, Plaintiffs' customers "likely will be unhappy" with these changes and will "hold Plaintiffs responsible for the change." *Id.* ¶ 32. Plaintiffs' brands, reputation, and customer goodwill will thus be "seriously damage[d]" by the resulting "rate-shock many customers will suffer" when the new rule is implemented. *Id.* ¶ 34. Worse still, many customers "will likely have to cut back services in an effort to limit their monthly expenses"—a non-speculative concern echoed not only by the civil rights *amici* here, but also numerous California-based wireless consumers who directly opposed the new surcharge rule before the CPUC. *Id.* ¶ 35 & n.7; *see also* Karanjia Decl., Ex. 11.

prevail on their claims that federal law preempts the CPUC's connections-based rule: (i) the rule is facially "inconsistent with" the FCC's Universal Service rules in violation of 47 U.S.C. § 254(f); (ii) the rule violates Section 254(f) and the FCC's requirement of competitive neutrality by unfairly discriminating against Plaintiffs as compared with local exchange carriers ("LECs"); and (iii) the rule unfairly discriminates against Plaintiffs Assurance and MetroPCS in their roles as providers of wireless service to low-income participants in the federal Affordable Connectivity Program, as compared with wireless carriers who are exempt from the connections-based rule when they provide similar service to participants in the LifeLine program. Each ground is alone sufficient to establish likelihood of success on the merits. And, at a minimum, Plaintiffs have presented "serious questions going to the merits" of each claim, supporting the grant of a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

**A.  The CPUC Rule Is "Inconsistent With" FCC Rules.**

Section 254(f) provides that "[a] State may adopt regulations *not inconsistent with* the [FCC's] rules to preserve and advance universal service." 47 U.S.C. § 254(f) (emphasis added). The statute thus expressly preempts and "constrains state regulation by prohibiting regulations inconsistent with FCC rules to preserve and advance universal service." *AT&T Commc'ns, Inc. v. Eachus*, 174 F. Supp. 2d 1119, 1123 (D. Or. 2001). As Plaintiffs explained, the Ninth Circuit has defined "inconsistent" to mean "incompatible, incongruous, [or] inharmonious." *Ecological Rts. Found. v. PG&E Co.*, 874 F.3d 1083, 1095 (9th Cir. 2017) (citing dictionary definitions); *see also* PI Br. at 16 (citing definitions reflecting that "inconsistent" means "lacking in harmony" or "[l]acking agreement among parts"); *Decker v. Nw. Env't. Def. Ctr.*, 568 U.S. 597, 617 (2013) (Scalia, J., concurring in part and dissenting in part) (using "inconsistent with" to mean "different from").

The CPUC, however, completely ignores the statutory text and this precedent. *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006) ("To determine whether the [statute] preempts Seattle's action, *we begin with the statutory text*." (emphasis added; citation omitted)).[4] The CPUC also ignores recent FCC decisions (upheld on judicial review) confirming

---

[4] "[T]he Supreme Court has already determined that if a 'statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *R.J. Reynolds Tobacco Co.*

that Section 254(f) expressly preempts state Universal Service rules that diverge from the FCC's Universal Service rules in material respects. In the 2015 *Open Internet Order*, for example, the FCC reasoned that "[b]ecause our action today precludes . . . federal universal service contribution assessments on broadband Internet access services that are not currently assessed, we conclude that any state requirements to contribute to state universal service support mechanisms that might be imposed on such broadband Internet access services would be inconsistent with federal policy and therefore *are preempted by section 254(f)*." *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5837 n.1477 (2015) (emphasis added), *pets. for rev. denied*, *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S. Ct. 475 (2018). In other words, the FCC recognized that state Universal Service rules governing issues such as which services should (or should not) be subject to assessment must track their federal counterpart rules. Three years later, the FCC reaffirmed the same interpretation of Section 254(f). *See Restoring Internet Freedom*, 33 FCC Rcd. 311, 787 n.1658 (2018), *vacated in part on other grounds*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019). These interpretations of Section 254(f) are consistent with the statutory text and entitled to deference. *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 307 (2013).

The CPUC's refusal to engage with both the statutory text and the precedent is understandable, as the CPUC is forced to concede that its connections-based rule fundamentally diverges from— and thus is "incongruous" or "inharmonious" with, *Ecological Rts. Found.*, 874 F.3d at 1095—the FCC's longstanding revenues-based rule. *See* Opp. at 14 ("The T-Mobile Carriers note that an access-line charge is different than the federal surcharge mechanism, which is true.").

The CPUC instead seeks refuge in a 1997 decision that rejected a preemption challenge to the CPUC's *current* (and longstanding) surcharge regime—the revenues-based regime that the CPUC must continue to adhere to unless and until the FCC departs from a revenues-based approach. *See* Opp. at 14-15 (citing *Util. Reform Network v. CPUC*, 26 F. Supp. 2d 1208 (N.D. Cal. 1997) ("*TURN*")). For multiple reasons, *TURN* does not support the CPUC's position.

---

*v. Cnty. of L.A.*, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). The CPUC does not argue otherwise.

7

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

*First*, unlike Plaintiffs here, TURN argued that the statute itself explicitly prohibited States from adopting surcharges that are paid by end-users. The Court disagreed, pointing to legislative history stating that "'the bill does not presume that any particular existing mechanism for universal service must be maintained or discontinued'" and concluding that the statute therefore did not "foreclose" the CPUC's "use of end-user surcharges." *Id.* at 1215 (citation omitted). Here, by contrast, Plaintiffs do not allege that Section 254(f), by its own terms, prohibits the use of a connections-based mechanism; on the contrary, the CPUC would be free to use such a mechanism *if* the FCC adopted it. Rather, Plaintiffs argue that the CPUC is not free to adopt a divergent approach that fundamentally differs from that of the FCC. The point is not that the statute categorically prohibits a particular methodology or prescribes a particular methodology, but rather that it simply requires *consistency with* FCC rules governing the fundamental aspects of Universal Service mechanisms.

*Second*, TURN—in contrast with Plaintiffs here—heavily relied on a *recommended* decision by a federal-state joint board that focuses on Universal Service. *See id.* at 1214. But, as the court noted, "the recommended decision is not itself a final decision by the FCC concerning the proper interpretation of the Telecommunications Act." *Id.*; *see also id.* at 1215 ("The FCC Order itself . . . does not explicitly state that the Commission agrees with the Joint Board's interpretation of the statute"). Nor was an "ambiguous reference to a congressional mandate" regarding Universal Service in an FCC order sufficient to foreclose the CPUC's adoption of an end-user surcharge. *Id.* Here, in contrast, Plaintiffs are relying on binding FCC rules and decisions to show that the CPUC's new approach is "inconsistent with" the FCC's rules in violation of Section 254(f). *See* PI Br. at 5-7, 16-19 (citing 47 C.F.R. § 54.709(a), (a)(3) and numerous FCC decisions).

*Third*, TURN was unable to point to any FCC decisions expressing concerns or opposition to an end-user surcharge approach; to the contrary, the FCC expressly allowed pass-through of fees to end users—a result *consistent with* the CPUC rule. *See* 26 F. Supp. 2d at 1214-15 (citing *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 9211, ¶¶ 853-55 (1997), *aff'd in part, rev'd in part, and remanded in part on other grounds*, *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999)). This sharply contrasts with this case in which the FCC raised both serious questions about the legality of a connections-based approach and significant concerns about how such an

8

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

approach would operate in practice. *See Universal Serv. Contribution Methodology: A Nat'l Broadband Plan for Our Future*, 27 FCC Rcd. 5357, 5439, ¶¶ 225-26 (2012) ("*FCC 2012 FNPRM*") (addressing logistical and implementation concerns); PI Br. Br. at 9.[5]

The CPUC's brief reliance on a portion of the Ninth Circuit's *MetroPCS* opinion (Opp. at 15) also does not support its position. The claim that the Ninth Circuit rejected was *not* an *express* preemption claim under Section 254(f); rather, it was an *implied* preemption claim (alleging conflict preemption), and the Court stressed that the FCC order relied on was "unclear" and "tentative." *See MetroPCS*, 970 F.3d at 1117-18, 1125-26. Not so here. As explained above, the FCC has unequivocally held that asymmetrical state Universal Service rules "are preempted by section 254(f)." *See supra* at 7 (citing *Open Internet Order* and *Restoring Internet Freedom Order*).

Finally, the CPUC insists that its surcharge overhaul must pass muster because other States have experimented with various types of connections-based rules. Opp. at 15-16. But, as Plaintiffs pointed out (PI Br. at 10 n.5) and the CPUC does not dispute, the vast majority of States that have adopted such rules apply them to Telecommunications Relay Service ("TRS"),[6] which is not a Universal Service program[7] and therefore is not subject to Section's 254(f)'s explicit limitations on state Universal Service programs. Nor does the CPUC dispute that three of the States that the CPUC staff identified as having connections-based Universal Service programs contain exemptions for wireless carriers. *See* PI Br. at 10 n.5. Indeed, Arizona, which the CPUC highlights as a connections-based

---

[5] The CPUC understandably does not rely on the *TURN* decision's holding that TURN "may not challenge the CPUC's compliance with the substantive provisions of the Telecommunications Act by means of a preemption cause of action." 26 F. Supp. 2d at 1214. That conclusion is contrary to Supreme Court precedent. *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (permitting action for declaratory and injunctive relief against a state PUC based on preemption under the federal Communications Act); *see also MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1121 (9th Cir. 2020) (similar).

[6] *See, e.g.*, 220 Ill. Comp. Stat. 5/13-703(c); Iowa Code §§ 477C.3, 477C.7; Minn. Stat § 237.52; Miss. Code Ann. §§ 77-3-505, 507; *In re Dual Party Relay Serv. Monthly Maintenance Surcharge*, No. 1990-UA-156 (Miss. Pub. Serv. Comm'n Oct. 5, 2017); N.C. Gen. Stat. § 62-157; N.D. Cent. Code §§ 54-44.8-03, 8-08; N.H. Code Admin. R. Ann. PUC 404.09; Ohio Rev. Code Ann. § 4905.8; Ohio Admin. Code 4901:1-6-36; S.D. Codified Laws § 49-31-51; S.D. Admin. R. 20:10:32:10; W. Va. Code R. § 150-21-1 to -13.

[7] TRS is subject to a different statutory provision (Section 225 rather than Section 254 of the Communications Act), and the TRS Fund is distinct from the federal Universal Service Fund. *See* 47 U.S.C. § 225; 47 C.F.R. § 64.604(c)(5)(iii); *see also FCC 2012 FNPRM*, 27 FCC Rcd. at 5435, ¶ 217.

9

pioneer (Opp. at 15), initially applied its rule only to wireline (not wireless) carriers[8] and now—like other States—adopts a "hybrid" approach for the Arizona Universal Service Fund with (i) a flat-rate surcharge of approximately $0.20 for certain service providers, and (ii) a revenues-based approach for other providers.[9] Most important, the CPUC fails to identify any judicial precedent sustaining these rules against a preemption challenge. Plaintiffs are unaware of any such decision.

In sum, the CPUC rule is not merely different from the FCC's Universal Service rules in some minor respect—it is diametrically opposed to the FCC's approach and is therefore "inconsistent with" that approach within the meaning of Section 254(f). As the CPUC acknowledges, the FCC has repeatedly and explicitly considered the options of adhering to its longstanding revenues-based approach or instead pivoting to a connections-based approach. *See* Opp. at 15 ("As the T-Mobile Carriers note, the FCC has long debated whether an access-line surcharge is preferable to a revenue-based surcharge."). At each turn, however, the FCC has stayed the course. *See* PI Br. at 8-9.

Moreover, one of the CPUC's *explicit goals* in the Decision was to *reject* the FCC's approach to Universal Service: The CPUC touted its new rule as "ensur[ing] the stability and sufficiency of the universal service contribution over time" precisely "because access line counts would *not be subject to differences in* carrier reporting methods and business models or *FCC service classifications*." Decision at 36 (emphasis added); *see also id.* at 27 ("The time that the FCC is taking to consider reclassification of telecommunications services will not help California address the immediate need to stop further reductions in PPP surcharge collection."). But that is a feature, not a bug, of the federal regulatory scheme. The FCC made a considered policy decision that certain services—notably, broadband—should not be subject to federal or state Universal Service fees, and it has determined that a revenues-based approach is competitively neutral, easily administrable, and avoids economic distortions. *See* PI Br. at 2, 8-9, 18 & n.17. The CPUC was unabashed in its decision to part ways with the FCC. Its new rule is therefore plainly "inconsistent with" the FCC's

---

[8] *Application of Arizona Telephone Company for Approval of the Arizona Utility Plan*, Docket No. U-2063-87-290, et al., Decision No. 56639 (Ariz. Corp. Comm. Sept. 22, 1989) at 17 ("[O]ur order will be limited to all ACC jurisdictional local exchange and interexchange carriers.").

[9] *See* A.A.C. R14-2-A1204(B); *Notice of Proposed Amends. to the Arizona Universal Serv. Fund*, No. 78817, 2022 WL 17902753, at *1-2 (Arizona Corp. Comm. Dec. 15, 2022). Other States similarly have adopted "hybrid" systems—an approach the CPUC rejected. *See, e.g.*, Decision No. NUSF-119/PI-233, 2021 WL 1987277, at *27 (NE PSC May 11, 2021); Utah Admin. Code R746-8-301(1)(e)(ii).

---

10

rules and preempted by Section 254(f). *See Open Internet Order*, 30 FCC Rcd. at 5837 n.1477; *Restoring Internet Freedom Order*, 33 FCC Rcd. at 787 n.1658.[10]

**B. The CPUC's Rule Unfairly Discriminates Against Plaintiffs Relative to LECs.**

Plaintiffs showed that the connections-based rule also violates the FCC's competitive-neutrality requirement and Section 254(f) by unfairly discriminating against Plaintiffs, whose revenues are principally derived from nonsurchargeable *interstate* services (in particular, mobile broadband) as compared with LECs, whose revenues largely come from surchargeable *intrastate* telecommunications service. PI Br. at 19-21. The CPUC does not dispute the record evidence showing that wireless carriers such as Plaintiffs derive the vast majority of their revenues from broadband service, as opposed to voice service, while the opposite is true for LECs and other landline telephone service providers. *See* Decision at 16 (noting the "significant variation between wireline and wireless carriers in the percentage of intrastate revenue carriers allocate") (citing Staff Report Part 1 at 22)). Nor does the CPUC even attempt to refute that Plaintiffs derive more than 75% of their wireless service revenues from nonsurchargeable broadband service. Barnes Decl. ¶ 16.

Instead, the CPUC maintains that there can be no unlawful discrimination and no competitive-neutrality violation because Plaintiffs "don't have to pay the surcharge." Opp. at 17. This recycled version of the CPUC's flawed standing argument fares no better here. *See*, *supra*, Section I. The CPUC cites no authority for its argument—and there is none. To the contrary, the Ninth Circuit's *MetroPCS* decision and other cases show that the argument is baseless. In ongoing litigation in this Court, MetroPCS—a prepaid carrier *with exclusively tax-inclusive plans* (*see* Barnes Decl. ¶ 11)—is challenging surcharges that the CPUC had imposed on prepaid wireless services in 2017 and 2018. Both the Ninth Circuit and this Court found no impediment to MetroPCS's as-applied preemption claims alleging violations of the competitive-neutrality requirement based on the theory

---

[10] Because this inconsistency is apparent from a comparison of the CPUC's Decision with the FCC's rules and decisions, it is irrelevant that the FCC has not reached out to expressly preempt any State's connection-based rule. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000) (Supreme Court "has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists."). Indeed, a statutory provision such as Section 254(f) expressly preempting inconsistent state rules would be unnecessary and superfluous if, as the CPUC suggests, the onus fell on the FCC to police the Universal Service regimes of all fifty States. Regardless, the CPUC has not identified any petition filed with the FCC requesting preemption of any of the state approaches on which the CPUC relies.

that the increased surcharge burden was somehow MetroPCS's "own choice[]." Opp. at 17. Quite the opposite: both courts made clear that MetroPCS presented viable competitive-neutrality claims that should move forward. *See MetroPCS*, 970 F.3d at 1110, 1126; *MetroPCS Cal., LLC. v. Batjer*, 2021 WL 4311468, at *7 (N.D. Cal. Sept. 22, 2021). Notwithstanding the tax-inclusive nature of MetroPCS's plans, the Ninth Circuit explained that, "[t]o the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted." 970 F.3d at 1121. The Court also cited a Fifth Circuit decision for the proposition that "competitive neutrality at least prohibits putting some providers 'at a distinct competitive disadvantage compared with' other providers." *Id.* at 1120-21 (agreeing with *AT&T Corp. v. PUC of Tex.*, 373 F.3d 641, 647 (5th Cir. 2004)).

That is exactly what the CPUC's rule does to Plaintiffs. It places them at a distinct competitive disadvantage compared with LECs. That is because the connections-based rule subjects Plaintiffs to a much higher surcharge burden relative to their revenues from surchargeable (intrastate telecommunications) service.

Equally unavailing is the CPUC's simplistic assertion that there can be no competitive-neutrality violation because, in absolute terms, all carriers will pay the same surcharge amount per connection. Opp. at 17. "[T]he proper inquiry is whether the *effect* of the legal requirement, rather than the method imposed, is competitively neutral." *Fed.-State Joint Bd. on Universal Serv.*, 15 FCC Rcd 15168, 15177, ¶ 22 (2000). And the CPUC concedes that "T-Mobile Carriers may be unequally *affected*" by the CPUC's rule. Opp. at 17. Under controlling precedent, that disproportionate impact is sufficient to establish a competitive-neutrality violation. *See AT&T*, 373 F.3d at 647 (explaining that there was a "competitive disadvantage" because one subset of carriers was "burden[ed] . . . more severely" than other carriers); *CPUC Petition for Delegation of Additional Auth. Pertaining to Area Code Relief & Nxx Code Conservation Measures*, 14 FCC Rcd. 17486, 17495, ¶ 18 (1999) ("[A] 'competitively neutral' cost recovery mechanism should not give one service provider an appreciable, incremental cost advantage over another service provider."); *Petition of Network Commc'ns Int'l Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c)*, 35 FCC Rcd. 8348, 8351-52, ¶¶ 9-10, 14 (2020) (USF exemption request denied where it would "give one set of interstate voice service providers a regulatory advantage over others, violating our neutrality goals").

---

12

**C.    The CPUC Rule Unfairly Discriminates Against Assurance and MetroPCS.**

The CPUC entirely ignores Plaintiffs' showing that its new rule also unfairly discriminates against Plaintiffs Assurance and MetroPCS when they are providing wireless service to low-income recipients of subsidies under the federal Affordable Connectivity Program ("ACP") because they do not benefit from the exemption afforded to providers of similar service to participants in the LifeLine program. *See* PI Br. at 21 n.19; Comp. ¶¶ 68-69, 82.b.

In *MetroPCS*, the Ninth Circuit rejected the CPUC's argument that prepaid and postpaid services are sufficiently dissimilar to justify different surcharge burdens: "We see no meaningful distinction between prepaid and postpaid services that could justify imposing the higher surcharge only on prepaid services. . . .  Prepaid and postpaid services offer the same telecommunications options of voice, text messaging, and data." 970 F.3d at 1123. The same logic applies here. Both Assurance and MetroPCS (when providing service to ACP recipients) and other wireless carriers (when providing service to LifeLine recipients) provide the same types of wireless broadband services to low-income consumers. Yet Assurance and MetroPCS are required to remit the connections-based surcharge, while providers of LifeLine service are exempt. *See* Decision at 75.

**III. Plaintiffs Will Suffer Irreparable Injury Absent Injunctive Relief.**

Plaintiffs demonstrated how, why, and to what extent they will suffer irreparable financial, reputational, and competitive harm if the CPUC's new rule is allowed to go into effect on April 1, 2023. PI Br. at 10-12, 22-25; Barnes Decl. ¶¶ 18-37. The CPUC offers no contrary evidence. Nor does it address the case law demonstrating that such injuries have routinely been recognized as irreparable harms for purposes of obtaining injunctive relief. PI Br. at 22-25. Instead, once again, the CPUC repeats its flawed theory that these well-founded harms are "self-inflicted." As shown above, however, that argument fails on numerous counts.  *See*, *supra*, Section I.

With no contrary evidence or law to rely on, the CPUC falls back on baseless procedural quibbles with Mr. Barnes's declaration. *See* Opp. at 22.[11] This Court has rejected similar, meritless

---

[11] As the Senior Director–Tax at Plaintiffs' parent company (Barnes Decl. ¶¶ 1-3), Mr. Barnes has personal knowledge of Plaintiffs' businesses, including, among other things, their customer base, competitive environment, brand capital, and goodwill. The CPUC's objections for lack of foundation and hearsay are thus baseless. *See Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 2022 WL 4830698, at *6 (S.D. Cal. Sept. 30,

objections before, and should do so here. *U.S. WeChat Users All.*, 488 F. Supp. 3d at 917 n.7 (overruling government's objections to declarations in support of preliminary injunction motion) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Given "the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Thus, courts may consider "hearsay for purposes of deciding whether to issue the preliminary injunction." *Repub. of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

The Court should also reject the CPUC's unwarranted request to require Mr. Barnes to appear at the hearing on this motion. Given the CPUC's failure to introduce any contrary evidence or even identify any genuinely contested factual questions—coupled with the fact that the motion turns principally on pure questions of law—there is no need to call Mr. Barnes, who currently plans to be in Mexico with his family from March 11-15. To the contrary, doing so would unnecessarily take up time that the Court and the parties could spend more productively on addressing the salient legal questions before the Court. *See, e.g.*, *Fid. Nat'l Title Ins. Co. v. Castle*, 2011 WL 5882878, at *3 (N.D. Cal. Nov. 23, 2011) ("A preliminary injunction may be granted on the basis of affidavits.").[12]

## IV. The Balance of Equities and Public Interest Weigh in Favor of Granting Relief.

The balance of equities heavily favors Plaintiffs' request for a preliminary injunction. The CPUC's contrary argument is based on the unsubstantiated and demonstrably false premise that Plaintiffs "seek to suborn California's regulatory scheme to their private interests." Opp. at 18. In

---

2022)). Likewise, the CPUC's objections on grounds of speculation and improper opinion evidence miss the mark. Based on his knowledge of Plaintiffs' businesses, deep experience in the wireless industry, and accounting expertise (*see* Barnes Decl. ¶¶ 3-4), Mr. Barnes may competently testify about the likely effects of the new connections-based surcharge mechanism on Plaintiffs' competitive position, customer relationships, reputation, and goodwill. *See Salton Sea Venture, Inc. v. Ramsey*, 2011 WL 4945072, at *8 (S.D. Cal. Oct. 18, 2011). Furthermore, Mr. Barnes explained in detail how he performed the financial-impact calculations included in his declaration, which were based on records kept in the ordinary course of business. *See* Barnes Decl. ¶¶ 23-24. There is nothing speculative about these calculations.

[12] Contrary to the CPUC's suggestion, Plaintiffs did not unreasonably delay bringing this action, which required careful analysis, advance preparation, and internal coordination before filing. The CPUC's written decision was issued on October 24, 2022, and Plaintiffs filed their Complaint and preliminary injunction motion on February 1, 2023—two months *before* the CPUC's rule is scheduled to go into effect. By contrast, *Oakland Trib., Inc. v. Chron. Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985), cited by the CPUC (Opp. at 12 n.9), involved a "long delay" of almost a full year—even though the alleged harms occurred well before the plaintiff filed suit and even became moot with the passage of time (unlike here).

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483

so arguing, the CPUC continues to minimize the serious inequitable impacts of its new rule. Those impacts are detailed in the comments from consumer groups that opposed the new rule and the *amicus* brief filed by civil rights organizations. *See* PI Br. at 10-12; Amicus Br. for Multicultural Media, Telecom & Internet Council, ALLvanza, California & Hawaii Conference of the NAACP, and LatinoJustice PRLDEF (Dkt. 23) at 4, 7 (explaining that CPUC's rule "will make wireless service . . . less affordable and accessible to those who need it most" and "disproportionately hurt low-income individual[s] and communities of color"). The CPUC ignores both.

Nor does the CPUC dispute that it will not suffer *any* prejudice or harm if a preliminary injunction is granted. Notably, the CPUC makes no claim that doing so will cause any underfunding of its Universal Service programs. *See* PI Br. at 13 & n.9, 24-25. To the contrary, the CPUC concedes it can maintain full funding under its current revenues-based approach by "increas[ing] the surcharge amount" on the existing surcharge base. Opp. at 5; *see also* PI Br. at 13 & n.9.

## V.  There is No Reason to Require a Bond.

While a bond may be required where the party opposing a preliminary injunction has shown that it would otherwise sustain "costs and damages," Fed. R. Civ. P. 65(c), that is not the case here. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (bond not required where "there is no evidence the party will suffer damages from the injunction."). Because the CPUC "did not tender any evidence" of damages, a bond is unnecessary and unwarranted. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *see also Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000) (no bond required where "the government did not show" there would be "any costs or damages suffered by the government"). Further, as discussed above, the CPUC does not dispute that the existing surcharge methodology provides sufficient funding for its Universal Service programs and that there is no actual or anticipated funding shortfall. As a result, and given the significant public interest in vindicating federal interests, the Court should decline to require a bond. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 548 (N.D. Cal. 2020) (declining to require bond given "significant public interest at stake").

**CONCLUSION**

The Court should grant this motion and issue the requested preliminary injunction.

15

1

Dated:  March 9, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

DLA PIPER LLP (US)

By:  */s/ Peter Karanjia*

Peter Karanjia (admitted *pro hac vice*)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000
peter.karanjia@us.dlapiper.com

Kathleen S. Kizer (SBN 246035)
500 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2500
kathy.kizer@us.dlapiper.com

Ben Fabens-Lassen (SBN 348874)
Gaspard Rappoport (SBN 340335)
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
(310) 595-3000
ben.fabens-lassen@us.dlapiper.com
gaspard.rappoport@us.dlapiper.com

Attorneys for Plaintiffs

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
*Assurance Wireless USA, L.P., et al. v. Reynolds, et al.*, Case No. 3:23-cv-00483