Peter Karanjia (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
500 8th Street, NW
Washington, D.C. 20004
Tel.:   (202) 799-4000
Email: peter.karanjia@us.dlapiper.com

Kathleen S. Kizer (SBN 246035)
**DLA PIPER LLP (US)**
500 Mission Street, Suite 2400
San Francisco, CA 94105
Tel.:   (415) 836-2500
Email: kathy.kizer@us.dlapiper.com

Ben Fabens-Lassen (SBN 348874)
Gaspard Rappoport (SBN 340335)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Tel.:   (310) 595-3000
Email: ben.fabens-lassen@us.dlapiper.com
Email: gaspard.rappoport@us.dlapiper.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ASSURANCE WIRELESS USA, L.P.; METROPCS CALIFORNIA, LLC; SPRINT SPECTRUM LLC; T-MOBILE USA, INC.; and T-MOBILE WEST LLC, | Case No. 3:23-cv-00483-LB |
| Plaintiffs, | |
| v. | **PLAINTIFFS' NOTICE OF APPEAL** |
| ALICE B. REYNOLDS, President of the California Public Utilities Commission, in her official capacity; KAREN DOUGLAS, Commissioner of the California Public Utilities Commission, in her official capacity; DARCIE L. HOUCK, Commissioner of the California Public Utilities Commission, in her official capacity; JOHN REYNOLDS, Commissioner of the California Public Utilities Commission, in his official capacity; and GENEVIEVE SHIROMA, Commissioner of the California Public Utilities Commission, in her official capacity, | **PRELIMINARY INJUNCTION APPEAL** Complaint Filed:  February 1, 2023 |
| Defendants. | |

1

## PLAINTIFFS' NOTICE OF APPEAL

2

   PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1292(a)(1), Plaintiffs—Assurance

3

Wireless USA, L.P; MetroPCS California, LLC; Sprint Spectrum LLC; T-Mobile USA, Inc.; and

4

T-Mobile West LLC—hereby appeal to the United States Court of Appeals for the Ninth Circuit

5

from the District Court's Order filed on March 31, 2023 and entered on April 1, 2023, Denying

6

Plaintiffs' Motion for a Preliminary Injunction.  ECF No. 37. A true and correct copy of the Order

7

is attached hereto as **Exhibit A**.

8

   PLEASE TAKE FURTHER NOTICE that, pursuant to the Ninth Circuit Rule 3-2, a

9

Representation Statement (United States Court of Appeals for the Ninth Circuit, Form 6) is attached

10

hereto.

11

 Dated:  April 3, 2023                                Respectfully submitted,

12

                                                      DLA PIPER LLP (US)

13

                                                      By:  */s/ Peter Karanjia*

14

                                                      Peter Karanjia (admitted *pro hac vice*)
                                                      500 8th Street, NW
15

                                                      Washington, DC 20004
                                                      (202) 799-4000
16

                                                      peter.karanjia@us.dlapiper.com

17

                                                      Kathleen S. Kizer (SBN 246035)
                                                      500 Mission Street, Suite 2400
18

                                                      San Francisco, CA 94105
                                                      (415) 836-2500
19

                                                      kathy.kizer@us.dlapiper.com

20

                                                      Ben Fabens-Lassen (SBN 348874)
                                                      Gaspard Rappoport (SBN 340335)
21

                                                      2000 Avenue of the Stars
                                                      Suite 400, North Tower
22

                                                      Los Angeles, CA 90067
                                                      (310) 595-3000
23

                                                      ben.fabens-lassen@us.dlapiper.com
                                                      gaspard.rappoport@us.dlapiper.com
24

                                                      Attorneys for Plaintiffs
25

26

27

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form06instructions.pdf

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

> All Appellants: (i) Assurance Wireless USA, L.P.; (ii) MetroPCS California, LLC; (iii) Sprint Spectrum LLC; (iv) T-Mobile USA, Inc.; and (v) T-Mobile West LLC

Name(s) of counsel (if any):

> Peter Karanjia (DLA Piper LLP), Kathleen Sue Kizer (DLA Piper LLP), Gaspard Rappoport (DLA Piper LLP) and Ben Fabens-Lassen (DLA Piper LLP)

Address: | 500 Eighth Street, NW Washington, DC 20004 (Mr. Karanjia)

Telephone number(s): | 202-799-4135 (Mr. Karanjia)

Email(s): | peter.karanjia@dlapiper.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ⦿ Yes   ◯ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

> All Appellees: Alice B. Reynolds; Karen Douglas; Darcie L. Houck; John Reynolds; and Genevieve Shiroma

Name(s) of counsel (if any):

> David W. Fermino, Jonathan Koltz, Ian Paul Culver, Vanessa M. Baldwin

Address: | 505 Van Ness Avenue, San Francisco, CA 94102

Telephone number(s): | 415-696-7359 (Mr. Fermino)

Email(s): | david.fermino@cpuc.ca.gov; ian.culver@cpuc.ca.gov

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Attached to this Statement is a list of contact information for above-listed counsel for Appellants

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                      *2*                      *New 12/01/2018*

# ATTACHMENT TO NINTH CIRCUIT REPRESENTATION STATEMENT

**Kathleen Sue Kizer**
DLA Piper LLP US
555 Mission Street
Suite 2400
San Francisco, CA 94105-2933
415-615-6003
Fax: 415-659-7303
Email: kathy.kizer@us.dlapiper.com

**Gaspard Rappoport**
DLA Piper LLP US
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
310-595-3000
Email: gaspard.rappoport@dlapiper.com

**Ben Fabens-Lassen**
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
310-595-3000
Email: ben.fabens-lassen@dlapiper.com
Registered for Electronic Filing in the Ninth Circuit

# EXHIBIT A

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ASSURANCE WIRELESS USA, L.P., et al., | Case No. 23-cv-00483-LB |
| Plaintiffs, | |
| | **ORDER DENYING PRELIMINARY INJUNCTION** |
| v. | |
| ALICE B. REYNOLDS, et al., | Re: ECF No. 4 |
| Defendants. | |

## INTRODUCTION

The plaintiffs — T-Mobile and three of its subsidiaries — are wireless carriers that challenge a new California Public Utilities Commission (PUC) rule that changes how California funds universal-service programs, which expand public access to communications services. Under the federal Telecommunications Act, the federal government and states both fund universal service: the FCC assesses surcharges on common carriers' interstate and international services, and states assess surcharges on the carriers' intrastate services. The FCC assesses its surcharges based on a percentage of carriers' interstate revenues. California has done the same for intrastate revenues, but under its new rule, beginning April 1, 2023, it will assess surcharges as a flat rate per access line. (An access line is a telephone number, essentially.) The FCC has considered, but has not adopted, a similar flat-rate approach.

Under the Telecommunications Act, a state's rule cannot be "inconsistent with" the FCC's rule, and it must be competitively neutral, meaning that it cannot unfairly favor one provider over another or one technology over another. The plaintiffs contend that the PUC's new flat-rate rule is (1) inconsistent with the FCC's rules and (2) not competitively neutral because it shifts the funding burden from local-exchange carriers (that derive revenue largely from intrastate voice services) to wireless carriers like the plaintiffs (that derive revenue principally from interstate services, particularly mobile broadband). The plaintiffs thus claim that the Act preempts the PUC rule, and they moved for a preliminary injunction to prevent the imposition of the new surcharges. The court denies the motion because the plaintiffs have not shown that the PUC exceeded its intrastate role or discriminated against them.

## REGULATORY, FACTUAL, AND PROCEDURAL BACKGROUND

### 1.   Federal-State Regulation of Telecommunications

Under the Communications Act of 1934, the FCC regulates interstate telecommunications services, and states regulate intrastate services. *California v. FCC*, 75 F.3d 1350, 1356 n.5 (9th Cir. 1996) (citing 47 U.S.C. § 152(a)–(b)). The Telecommunications Act of 1996 was "inserted into the Communications Act." *Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*, 423 F.3d 1056, 1062 n.1 (9th Cir. 2005). It was enacted "to promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (cleaned up). Like the Communications Act, it "is premised on a 'system of cooperative federalism,' in which participating states are key partners to the federal government in regulating the telecommunications industry." *MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020) (quoting *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 303 (2015)). "Under this scheme, states are, subject to the boundaries set by Congress and federal regulators, called upon to apply their expertise and judgment and have the freedom to do so." *Id.* (cleaned up).

### 2. Universal-Service Regulation

Universal service, or "[t]he universal availability of critical telecommunications services," "is a fundamental goal of federal telecommunications regulation." *Id.* at 1110 (cleaned up). "At the simplest level, increasing the number of people connected to the telecommunications network makes the network more valuable to all of its users by increasing its usefulness to them." *In re Fed.–State Joint Bd. on Universal Serv.*, 12 F.C.C. Rcd. 8776, 8783 at ¶ 8 (1997). The FCC has always been charged with advancing this goal, and "[s]tates have also historically exercised their jurisdictional authority to ensure the availability of universal service." *Picker*, 970 F.3d at 1110 (cleaned up). "The Telecommunications Act solidified the commitment by the FCC and states to ensuring the preservation and advancement of universal service." *Id.* (cleaned up); *see* 47 U.S.C. § 254.

Under the Telecommunications Act, "[a]ll providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service." 47 U.S.C. § 254(b)(4). Carriers that provide interstate services must contribute to universal-service mechanisms established by the FCC. *Id.* § 254(d). States "may adopt regulations not inconsistent with the [FCC]'s rules to preserve and advance universal service." *Id.* § 254(f). And "[e]very telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." *Id.*

### 3. The Universal-Service Programs, Surcharge Methodologies, and the new PUC Rule

To fund its federal universal-service programs, the FCC assesses universal-service surcharges on carriers based on a percentage of their interstate and international telecommunications-service revenues. 47 C.F.R. § 54.709(a). Similarly, the California PUC currently funds its state universal-service programs by imposing a surcharge based on a percentage of carriers' intrastate service revenues.[1] (Unlike the FCC's surcharge, the Commission's surcharge is imposed on "end users"

---

[1] Cal. Pub. Utils. Comm'n Decision, Ex. 1 to Karanjia Decl. – ECF No. 4-2 at 6, 13–14. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

United States District Court
Northern District of California

1   or subscribers but collected by carriers.[2]) But starting April 1, 2023, the Commission will use "a

2   new surcharge mechanism" that "assesses surcharges based on the number of active access lines

3   that a telephone corporation operates in California."[3]

4       The Commission's rulemaking process in aid of the new rule lasted from June 2021 until

5   October 2022 and included multiple rounds of notice and comment, including opposition from the

6   wireless industry and consumer groups.[4] In its decision adopting the new rule, the Commission

7   explained that "[c]ontinuous, year over year declines in the intrastate billing base for surcharges

8   has resulted in lower surcharge revenue collected for [state universal-service programs] compared

9   to the amount forecasted."[5] Since the FCC and the Commission adopted their percentage-of-

10  revenue surcharge methods in the 1990s, telecommunications technology has advanced, causing a

11  "dramatic decline" in landline services.[6] Between 2012 and June 2019, the number of voice

12  subscribers in California increased from 52.8 million to 56.8 million, but between 2012 and 2020,

13  the "intrastate revenue billing base" (which consists mostly of landline services) decreased by

14  fifty-eight percent, from $15.4 billion to $6.433 billion.[7]

15      The Commission also explained that "comments indicated that carriers implement different

16  policies regarding what services are eligible for . . . surcharges and how they should be assessed."

17  This is because of differing federal and state policies and the wide spectrum of carriers offering

18  differing services. These conditions make it difficult to determine whether surcharge contributions

19  are "appropriate, equitable, and nondiscriminatory."[8] Thus, "the existing surcharge mechanism is

20  uneven at best and potentially anti-competitive and discriminatory at worst."[9]

21      Under the Commission's current, revenues-based surcharge system, there is "significant

22

23  [2] *Id.* at 14.

    [3] *Id.* at 5.

24  [4] Cal. Pub. Utils. Comm'n Admin. R., Exs. 1, 3–11 to Karanjia Decl. – ECF Nos. 4-2, 4-4 to -12.

25  [5] Cal. Pub. Utils. Comm'n Decision, Ex. 1 to Karanjia Decl. – ECF No. 4-2 at 6.

26  [6] *Id.* at 21.

27  [7] *Id.* at 14–15.

    [8] *Id.* at 18–20.

28  [9] *Id.* at 21.

variation" between landline and wireless carriers "in the percentage of intrastate revenue [that] carriers allocate." The percentage "varies significantly depending on the provider as well as the service being offered, ranging from as high as [seventy-five] percent of the end user bill for traditional [landline] telephone service to [three] percent for facilities-based wireless services, and zero percent for broadband internet access service."[10]

The new, per-access-line rule is intended to implement a surcharge method that is "more sustainable," "technology neutral," "unambiguous," and "equitable."[11] The reason it is more "equitable" is that "all [end] users (residential, small business, large business) and all service types [will] pay the same amount." That is unlike "the current disproportionate burden on [landline] customer[s]," which under the new rule "will be shifted to all customers (wireline, [voice over internet protocol], and wireless) regardless of service type."[12]

The new rule's surcharge method is based on the number of active access lines that each carrier operates in California.[13] Access lines are defined as follows:

> [A] wire or wireless connection that provides a real time two way voice telecommunications service or [voice over internet protocol] service to or from any device utilized by an end user, regardless of technology, which is associated with a 10-digit NPA-NXX number or other unique identifier and a service address or Place of Primary Use in California.[14]

"All carriers [will] be required to count and report access lines in the same manner."[15] Each carrier will be assessed a monthly surcharge of $1.11 per access line, a rate that is subject to future change.[16]

---

[10] *Id.* at 19.

[11] *Id.* at 6–7, 20.

[12] *Id.* at 38.

[13] *Id.* at 5.

[14] *Id.* at 55.

[15] *Id.* at 20.

[16] *Id.* at 79.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 4. The Parties

The plaintiffs — T-Mobile USA, Inc., Assurance Wireless USA, L.P., MetroPCS California, LLC, Sprint Spectrum LLC, and T-Mobile West LLC — are wireless service providers. T-Mobile USA is the parent company of the other plaintiffs.[17] The subsidiary plaintiffs are registered with the PUC and therefore are subject to the pending rule.[18]

"Almost all" of the plaintiffs' wireless plans include multiple services: broadband data, text messaging, and voice (both intrastate and interstate).[19] "[C]onsumers increasingly rely on their wireless service to go online, download streaming video, and use apps that require the use of broadband data services."[20] Currently, the plaintiffs derive "more than" seventy-five percent of their wireless-service revenue from broadband services.[21] Also, they "frequently" offer wireless plans for households consisting of a primary wireless plan and additional lines for other family members.[22]

Assurance provides wireless plans "subsidized by federal programs" to "more than 350,000" California subscribers. "Thousands" of these subscribers are low-income consumers with plans subsidized by the FCC's Affordable Connectivity Program.[23] MetroPCS California has "millions" of California subscribers, and as with Assurance, "thousands" of them have plans subsidized by the Affordable Connectivity Program. All of MetroPCS California's plans are "tax-inclusive," meaning that all taxes, fees, and surcharges are included in a fixed monthly price.[24] Sprint has "over one million" California subscribers with tax-inclusive plans and "hundreds of thousands" with tax-exclusive plans (tax-exclusive means that taxes, fees, and surcharges are paid by the consumer as an

---

[17] Compl. – ECF No. 1 at 6–7 (¶¶ 10–14).

[18] *Id.* at 7 (¶ 15).

[19] *Id.* (¶ 16).

[20] Barnes Decl. – ECF No. 4-14 at 4–5 (¶ 15).

[21] *Id.* at 5 (¶ 16).

[22] *Id.* at 3 (¶ 7).

[23] Compl. – ECF No. 1 at 6 (¶ 11); Barnes Decl. – ECF No. 4-14 at 3–4 (¶ 10).

[24] Compl. – ECF No. 1 at 6–7 (¶ 12); Barnes Decl. – ECF No. 4-14 at 4 (¶ 11).

United States District Court
Northern District of California

addition to the monthly price for service).[25] T-Mobile West also has both tax-inclusive and tax-exclusive plans, and has "millions" of California subscribers with each type.[26]

The defendants — Alice Reynolds, Karen Douglas, Darcie Houck, John Reynolds, and Genevieve Shiroma — are Commissioners of the PUC. Ms. Reynolds is also the President.[27]

### 5. The Effect that the New Rule Will Have on the Plaintiffs

John Barnes, Senior Director of Tax for T-Mobile USA, described the effect the pending rule will have on the plaintiffs.[28] He is a certified public accountant with "over [twenty-five] years" of experience with telecommunications surcharges, fees, and taxes. At T-Mobile, he is responsible for "compliance with federal, state, and local laws governing surcharges, fees, and taxes."[29]

For the plaintiffs' tax-inclusive plans, because the new surcharge imposed by the pending rule will not be included in in those plans' monthly rate, the plaintiffs "will be forced to absorb the financial impact" of the new rule. Based on Mr. Barnes's analysis of the plaintiffs' business records, this will amount to "projected out-of-pocket costs of nearly $11 million per month in additional surcharges," "or more than $130 million per year."[30] This will erode the plaintiffs' market share and pressure their business plans in the "fiercely competitive" wireless market because it will be "far more difficult for [the] [p]laintiffs to compete for customers (for example, by offering more generous promotions and discounts for service in attempts to win customers from competitors)."[31]

For the tax-exclusive plans, the plaintiffs' customers will bear the financial burden of the new rule.[32] The amount of surcharges their customers will collectively pay "will increase by millions of

---

[25] Compl. – ECF No. 1 at 7 (¶ 13); Barnes Decl. – ECF No. 4-14 at 4 (¶ 12).

[26] Compl. – ECF No. 1 (¶ 14); Barnes Decl. – ECF No. 4-14 at 4 (¶ 13).

[27] Compl. – ECF No. 1 at 7–8 (¶ 17).

[28] Barnes Decl. – ECF No. 4-14.

[29] *Id.* at 2 (¶ 3).

[30] *Id.* at 6–8 (¶¶ 22–25).

[31] *Id.* at 8 (¶ 26).

[32] *Id.* (¶¶ 27–28).

dollars per month and tens of millions of dollars per year beyond current remittance amounts."[33] Particularly for customers on the tax-exclusive plans, the new surcharge will operate like a regressive tax and "will be especially burdensome for low-income and marginalized communities and families with multi-line wireless plans."[34]

The plaintiffs submitted additional evidence about the expected harm to their reputations, customer goodwill, and customer base.[35]

### 6. Relevant Procedural History and Jurisdiction

The defendants are sued in their official capacities.[36] The complaint has two claims: (1) preemption under the Communications Act of 1934, 47 U.S.C. § 254(f), and (2) a violation of the dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3, under 42 U.S.C. § 1983.[37] The plaintiffs seek declaratory relief, a preliminary and permanent injunction against the pending rule, and attorney's fees and costs under 42. U.S.C. § 1988.[38]

The court has federal-question jurisdiction, and the Eleventh Amendment is not a bar to this suit against state utility commissioners for prospective injunctive relief premised on federal preemption and constitutional violations. 28 U.S.C. § 1331; *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 641–46 (2002). All parties consented to magistrate-judge jurisdiction.[39] 28 U.S.C. § 636.

### STANDARD OF REVIEW

A preliminary injunction is "a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422

---

[33] *Id.* (¶ 29).

[34] *Id.* at 8–9 (¶ 30).

[35] *Id.* at 9–10 (¶¶ 31–37).

[36] Compl. – ECF No. 1 at 7–8 (¶ 17).

[37] *Id.* at 24–29 (¶¶ 75–91).

[38] *Id.* at 29 (Prayer for Relief).

[39] Consents – ECF Nos. 15, 18.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (9th Cir. 1984). The standards for a temporary restraining order and a preliminary injunction are the

2    same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A

3    movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable

4    harm that would result if an injunction were not issued, (3) that the balance of equities tips in favor of

5    the plaintiff, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*,

6    555 U.S. 7, 22–24 (2008). The irreparable injury must be both likely and immediate. *Id.* at 20–21;

7    *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

8        Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to

9    prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or

10   (2) that serious questions going to the merits were raised and the balance of hardships tips sharply

11   in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). In this continuum,

12   "the greater the relative hardship to [a movant], the less probability of success must be shown." *Id.*

13   After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated the sliding scale

14   approach, the "serious questions" prong of the sliding scale survived so long as the movant

15   satisfied the other elements for preliminary relief. *All. for the Wild Rockies v. Cottrell*, 632 F.3d

16   1127, 1131–32 (9th Cir. 2011). Thus, a temporary restraining order or preliminary injunction may

17   be appropriate when a movant raises "serious questions going to the merits" and the "balance of

18   hardships tips sharply in the plaintiff's favor," provided that the other elements for relief also are

19   satisfied. *Id.* at 1134–35.

20       A preliminary injunction "should not be granted unless the movant, by a clear showing, carries

21   the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Denial of a

22   preliminary injunction is reviewed on appeal for abuse of discretion. *All. for the Wild Rockies*, 632

23   F.3d at 1131.

24                                              **ANALYSIS**

25       The parties dispute whether the plaintiffs have standing, whether the PUC's new rule is

26   federally preempted, and whether the plaintiffs have established the other *Winter* factors. The

27   plaintiffs have standing but have not satisfied the standard for an injunction.

28

ORDER – No. 23-cv-00483-LB                          9

1. **Standing**

   The defendants contend that the plaintiffs lack standing because the PUC imposes universal-service surcharges on end users, not the carriers: if the carriers have tax-inclusive plans (meaning, plans with a fixed monthly rate) where they decide to pay the surcharge, that is a harm that they created and is not an injury fairly traceable to the PUC.[40] The plaintiffs respond that they are the direct object of the rule, must implement the new surcharge beginning on April 1, and face penalties if they do not and harm to their business models if they do.[41] The plaintiffs have standing because they are the direct object of a rule that will allegedly harm their existing business models.

   "The 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560). Article III requires "a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant. . . ." *Lujan*, 504 U.S. at 560–61. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo*, 136 S. Ct. at 1547.

   "A plaintiff is presumed to have constitutional standing to seek injunctive relief when the plaintiff is the direct object of government action challenged as unlawful." *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014) (cleaned up). The new rule requires the plaintiffs to comply with the PUC's regulatory scheme and allegedly affects their established business models. The plaintiffs have standing. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (wholesalers had standing to challenge liquor tax passed onto their customers because (1) they had to pay the tax even if their customers did not pay their bills and (2) the tax increased the price of their products compared to exempted products); *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 748–49 (9th Cir. 2020) (for standing purposes, the plaintiff did not "cause[]

---

[40] Opp'n – ECF No. 28 at 13–17.

[41] Reply – ECF No. 33 at 8–9.

its own injury when it has shown that, if it were to pursue any of the alternatives floated by [a state agency], it would remain worse off than it had been before" the state agency's action).

### 2. Federal Preemption

States "may adopt regulations not inconsistent with the [FCC]'s rules to preserve and advance universal service." 47 U.S.C. § 254(f). "Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." *Id.*

The plaintiffs contend that federal law expressly preempts the PUC's new rule in three ways: (1) the rule is inconsistent with the FCC's universal-service rule, in violation of § 254(f); (2) the rule violates § 254(f) and the FCC's requirement of competitive neutrality by unfairly discriminating against the plaintiffs (as compared with local-exchange carriers); and (3) the rule unfairly discriminates against plaintiffs Assurance and MetroPCS in their role as providers of wireless service to low-income participants in the federal Affordable Connectivity Program (as compared with wireless carriers that are exempt from the rule when they provide similar service to participants in California's LifeLine Program.)[42] The court denies the motion because the plaintiffs have not shown a likelihood of success on the merits or, assuming they satisfy the other elements of the *Winter* test, serious questions going to the merits of the preemption claim.

### 2.1  Whether the New Rule is Inconsistent with FCC Rules

The plaintiffs contend that California's access-line surcharge is expressly preempted because it is inconsistent with the FCC's revenues-based surcharge method for funding universal-service programs, in violation of § 254(f).[43] They assert that this is shown by the FCC's consideration (and rejection) of a connection-based approach and the FCC's concluding that its exempting broadband

---

[42] Mot. – ECF No. 4 at 24–29; Reply – ECF No. 33 at 11–19.

[43] Mot. – ECF No. 4 at 24–27; Reply – ECF No. 33 at 13–14 (describing the per-access-line method as "fundamentally differ[ing]" from the FCC's revenues-based method).

from universal-service assessments requires states to do the same.[44] The new rule is different from the FCC rule, but the plaintiffs did not establish that it is inconsistent and preempted.

To support their express-preemption argument, the plaintiffs rely on *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, which defines "inconsistent:" "incompatible, incongruous, [or] inharmonious."[45] 874 F.3d 1083, 1095 (9th Cir. 2017). But that case is not a preemption case. In any event, its discussion of "inconsistent" evokes conflict preemption, and the plaintiffs do not contend that they cannot comply with federal and state requirements or that the PUC rule impedes the objective of advancing universal service. *Mazurek*, 520 U.S. at 972 (noting the plaintiffs' burden); *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) (conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (cleaned up); *Metrophones Telecomms.*, 423 F.3d at 1072–73 (applying conflict-preemption principles in the "analysis of whether state requirements are 'inconsistent' with the federal regulations" under § 276(c) of the Telecommunications Act).

The plaintiffs argue only express preemption. The analysis turns on statutory construction and considers the purpose of the law. *English*, 496 U.S. at 78–79; *Jones v. Google LLC*, 56 F.4th 735, 739–40 (9th Cir. 2022); *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022) ("the task of statutory construction must in the first instance focus on the plain wording of the [preemption] clause" and considers "the surrounding statutory framework") (cleaned up).

The plaintiffs have not established that, under the Communications Act, the PUC's surcharge rule is inconsistent with the FCC's surcharge rule. *Jones*, 56 F. 4th at 740.

"A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service." 47 U.S.C. § 254(f). But the statute also gives states discretion:

> Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in

---

[44] Mot. – ECF No. 4 at 25–27 & n.18.

[45] *Id.* at 24.

that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

*Id.* That is, states have some "discretion to determine the manner in which carriers should contribute." *Util. Reform Network v. Cal. Pub. Utils. Comm'n*, 26 F. Supp. 2d 1208, 1214 (N.D. Cal. 1997). *Utility Reform* involved the PUC's imposition of end-user surcharges to fund two new intrastate universal-telephone-service programs. *Id.* at 1211. As the statutory excerpt above shows, § 254(f) requires carriers — not ender users — to contribute to the preservation and advancement of universal service. The FCC had interpreted an analogous section of the Act, § 254(d), to require carriers (not end users) to pay into the federal fund. A consumer group thus argued in *Utility Reform* that the end-user surcharge was "inconsistent" with the FCC's rules. *Id.* at 1214.

The court rejected the consumer group's assertion that the PUC decision conflicted with, and thus was preempted by, federal law: "The cases on which Plaintiff relies for this proposition . . . all involve instances in which a federal statute had 'occupied the field,' thereby preventing any state regulation of matters falling within the scope of the federal statute." *Id.* at 1213. It held that California had the authority to regulate "the manner in which telecommunications should contribute to the provision of universal services." *Id.* Because federal law allowed that state regulation, the plaintiff could not challenge the PUC's "compliance with the substantive provisions of the Telecommunications Act by means of a preemption cause of action." *Id.* at 1213–14. And even assuming that the consumer group could mount a preemption argument, the court held that the FCC had not interpreted the Act to prohibit the imposition of end-user surcharges to support universal access: "If the FCC interpreted the statute to bar the imposition of end-user surcharges, it would have been unnecessary for the Commission to explain why, as a policy matter, it preferred giving discretion to carriers and the states to determine how interstate carriers should recover their contributions to universal access services." *Id.* at 1215.

That analysis drives the outcome here: the PUC's surcharge method is here about the manner in which carriers contribute to universal service in California.

1    The plaintiffs counter that they are not arguing that § 254(f) by its own terms prohibits the use

2   of a connections-based mechanism. To the contrary, they agree that if the FCC adopted that

3   mechanism, the PUC could too.[46] But the plaintiffs' interpretation of the rule would mean that

4   states must mimic the FCC's surcharge approach, and anything else is inconsistent. But *Utility*

5   *Reform* rejected that interpretation. *Id.* at 1213 ("declaratory relief is available only when a federal

6   statute precludes State regulation of the matter being litigated"). The plaintiffs distinguish *Utility*

7   *Reform* as involving an FCC decision that was not final. They assert that by contrast here, the FCC

8   has picked a revenue-based surcharge, and the flat-rate access-line surcharge is plainly

9   "inconsistent" with the FCC's approach. But again, a "different" approach is not necessarily

10   "inconsistent." Or at least, the plaintiffs have not made a sufficient showing that it is.

11    A plain reading of the statute supports this conclusion. The PUC rule is not "inconsistent with

12   the Commission's rules to preserve and advance universal service." 47 U.S.C. §254(f). In fact, the

13   PUC adopted the rule to advance universal service. Under the statute, the PUC has the discretion

14   to determine the manner of the telecommunications carriers' contributions "to the preservation and

15   advancement of universal service in that" state. *Id.* The PUC rule is a "standard[] to preserve and

16   advance universal service within" California that "adopt[s] additional specific, predictable, and

17   sufficient mechanisms to support . . . [the] standard[] that do[es] not rely on or burden Federal

18   universal service support mechanisms." *Id.* No case supports the conclusion that the PUC must be

19   in lockstep with the FCC. And the statute fundamentally says only that the PUC rule cannot be

20   inconsistent with the FCC's rules advancing universal service, and it cannot adopt standards that

21   rely on or burden federal universal-service-support mechanisms. *Id.*

22    The plaintiffs rest their argument mostly on the FCC's debate about whether to move to an

23   access-line surcharge and its failure (so far) to do so. But that debate does not suggest that a state

24   cannot fund its universal-service programs through a method other than a revenue-based method.

25   Indeed, the scant authority that exists suggests that there is not preemption in circumstances like

26   these. There can be in other circumstances: the FCC has explicitly preempted states' assessing

27

28   ────────────
      [46] Reply – ECF No. 33 at 14.

surcharges for broadband service. But the PUC's rule doesn't assess surcharges on broadband. And in those FCC rules, the preemption was premised on the FCC's exercising its authority to forbear from imposing the Communications Act's requirements on broadband. *In re Protecting & Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5837 at ¶ 490 & n.1477 (2015); *In re Restoring Internet Freedom*, 33 F.C.C. Rcd. 311, 787 at ¶ 490 n.1658 (2018); *Mozilla Corp. v. FCC*, 940 F.3d 1, 17–18 (D.C. Cir. 2019); 47 U.S.C. § 160(a) (forbearance provision).

In the end, other states use access-line surcharge methods.[47] The plaintiffs have advanced no scenario that suggests preemption here. *English*, 496 U.S. at 79 (Congress "define[s] explicitly the extent to which its enactments pre-empt state law"); *MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1117 (9th Cir. 2020) (when "consider[ing] whether a federal agency has preempted state regulation," courts "ask whether the federal agency meant to pre-empt the state law") (cleaned up).

## 2.2    Whether the Rule is Discriminatory

The plaintiffs contend that the PUC's new rule violates § 254(f) and the FCC's requirement of competitive neutrality by unfairly discriminating against them in two ways.

First, they contend that the rule unfairly discriminates against them (as compared with local-exchange carriers) by shifting the funding burden from local-exchange carriers (that derive revenue largely from intrastate voice services) to wireless carriers like the plaintiffs (that derive revenue principally from interstate services, particularly mobile broadband). The effect of the surcharge affects wireless carriers and customers more because wireless customers have more lines (through family plans, for example) than landline customers.[48]

"[T]he FCC's competitive neutrality policy . . . is related to [§ 254]'s 'equitable and nondiscriminatory' mandate." *Picker*, 970 F.3d at 1120. In the universal-service context, "[t]he FCC has defined competitive neutrality to 'mean[] that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another.'" *Id.* (quoting *In re Fed.-State Joint Bd. on*

---

[47] Opp'n – ECF No. 28 at 20–21.

[48] Mot. – ECF No. 4 at 27–29.

United States District Court
Northern District of California

*Universal Serv.*, 12 F.C.C. Rcd. 8776, 8801 at ¶ 47 (1997)). Competitive neutrality "does not prohibit regulators from according different treatment to competitors whose circumstances are materially distinct." *Picker*, 970 F.3d at 1120 (cleaned up).

The contention that the PUC's rule discriminates against wireless carriers in favor of local-exchange carriers does not intuitively establish competitive disadvantage: end users, not carriers, pay the surcharges. All carriers are subject to the rule. Also, as discussed in the Background section, the PUC implemented the new rule to address the sustainability of the state's universal-service funding, given the decrease in revenue generated from landline services. The plaintiffs have not established that this is unfair or inequitable. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1099, 1104–05 (D.C. Cir. 2009) (disparate treatment of landline and wireless carriers was competitively neutral in light of similar sustainability concerns because the wireless carriers "were responsible for [a] surge in costs" for the universal-service fund and so "a solution targeting only [them] was hardly unfair").

Second, in a footnote in their opening brief and in fourteen lines in their reply brief, the plaintiffs contend that the rule unfairly discriminates against plaintiffs Assurance and MetroPCS when they are providing wireless services to low-income recipients of subsidies under the FCC's Affordable Connectivity Program because they do not benefit from subsidies provided to providers of similar services that participate in California's LifeLine Program.[49] The effect is minimal. *Rural Cellular Ass'n*, 588 F.3d at 1105 ("competitive neutrality does not require precise parity of treatment") (cleaned up). Assurance has "more than 350,000" California subscribers and MetroPCS has "millions," but they each have only "thousands" in the Affordable Connectivity Program.[50] And again, surcharges are born by users. Moreover, the benefit to competing carriers with subscribers in the LifeLine program is at least mitigated by the fact that for households, the LifeLine subsidy applies to only one member. The plaintiffs have not established unfair disadvantage. *Cf. Virgin Mobile USA, L.P. v. Keen*, 447 F. Supp. 3d 1071, 1096–98 (D. Kan.

---

[49] *Id.* at 29 n.19; Reply – ECF No. 33 at 19. *But see* Assurance's California Schedule of Rates, Ex. 3 to Culver Decl. – ECF No. 28-1 at 41 (Assurance apparently is in the LifeLine program).

[50] Compl. – ECF No. 1 at 6–7 (¶¶ 11–12); Barnes Decl. – ECF No. 4-14 at 3–4 (¶¶ 10–11).

United States District Court
Northern District of California

2020) (a state's surcharge distinction between two federal universal-service subsidies was discriminatory under § 254 only because the surcharge was assessed on the subsidies themselves).

*                    *                    *

In sum, the plaintiffs have not shown a likelihood of success on the merits or serious questions going to the merits.

### 3.  Other *Winter* Factors

The remaining *Winter* factors are whether there is a likelihood of irreparable harm if an injunction does not issue, whether the balance of equities tips in the plaintiffs' favor, and whether an injunction is in the public interest. *Winter*, 555 U.S. at 20.

First, the issue of irreparable harm is closer than the other factors. The PUC did not challenge the financial, reputational, and competitive harm that the plaintiffs allegedly will suffer.[51] That said, surcharges are borne by end users for all carriers, making it potentially hard to discern the irreparable harm. The plaintiffs contend that they have to absorb the costs for their prepaid contracts.[52] They do not explain why. The defendants characterize that decision as self-inflicted injury.[53] Assuming that the plaintiffs must shoulder the costs, that is irreparable injury if the injury resulted from the state's wrongful conduct because, as the plaintiffs point out, there is no road for recovery given the state's Eleventh Amendment immunity from suits for damages.[54] *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009) (the usual rule that monetary harm is not irreparable doesn't apply where the Eleventh Amendment bars any suit for monetary relief), *vacated and remanded on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). An eroding of good will under these circumstances would be irreparable injury too. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865–66 (9th Cir. 2017)

---

[51] Opp'n – ECF No. 28 at 23–27 (focused analysis on the balance of equities and whether an injunction is in the public interest).

[52] Mot. – ECF No. 4 at 30; Barnes Decl. – ECF No. 4-14 at 6 (¶¶ 22–25).

[53] Opp'n – ECF No. 28 at 15.

[54] Mot. – ECF No. 4 at 30.

United States District Court
Northern District of California

1   (an unrebutted declaration predicting harmed licensee goodwill was "substantial evidence" of an

2   "undermine[d] . . . business model").

3       Second, the remaining factors — the balance of equities and whether an injunction is in the

4   public interest — merge where the government is a party. *California v. Azar,* 911 F.3d 558, 575

5   (9th Cir. 2018). The public-interest inquiry "primarily addresses the impact on non-parties rather

6   than parties" and considers "the public consequences in employing the extraordinary remedy of

7   injunction." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931–32 (9th Cir. 2003). The plaintiffs

8   have not demonstrated that the balance of equities tip in their favor. They contend that injunctive

9   relief forestalls the burdens imposed on lower-income households (an argument perhaps slightly

10   inconsistent with its argument that it would be forced to assume the costs).[55] But the public

11   interest is advanced by sustaining universal service, as the PUC's rulemaking process

12   established.[56] The plaintiffs have not otherwise established that the balance of equities and the

13   public interest tips in their favor. *Winter*, 555 U.S. at 20.

14       In sum, the remaining *Winter* factors do not favor the plaintiffs.

15

16                         **CONCLUSION**

17       The court denies the plaintiffs' motion for a preliminary injunction. This resolves ECF No. 4.

18   **IT IS SO ORDERED.**

19       Dated: March 31, 2023

20                                   LAUREL BEELER
                                United States Magistrate Judge

21

22

23

24

25

26

---

27   [55] *Id.* at 32.

28   [56] *See supra* (summarizing the rule-making process); Opp'n – ECF No. 28 at 23–26 (same).